USHODAYA ENTERPRISES,
LTD., Plaintiff,

v.

V.R.S. INTERNATIONAL, INC. and
A. Vasudevan, Defendants.

No. 97 Civ. 1315(MGC).

United States District Court,
S.D. New York.

Aug. 13, 1999.

Law Offices of Leonard & Robert Shapiro by Leonard N. Shapiro, Robert J. Shapiro, New York City, for Plaintiff.

Purrington & McConnell by John H. McConnell, New York City, for Defendant.

## OPINION

CEDARBAUM, District Judge.

Ushodaya Enterprises, Ltd. ("Ushodaya") sues its former United States distrib-

utor, V.R.S. International, Inc. ("VRS") and Aramudh Vasudevan, for the use of the "Priya" name in connection with the sale of Indian pickles in the United States. Ushodaya seeks to cancel VRS's registrations for the "Priya" trademark, and to recover related damages, on the ground that defendants fraudulently procured the registrations from the United States Patent and Trademark Office ("PTO"). Ushodaya also asserts claims for trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. § 1051 *et seq.;* copyright infringement under title 17 of the United States Code; trademark infringement, unfair competition and deceptive business practices under the "common law;" and dilution and false advertising under the New York General Business Law. The defendants assert counterclaims, principally alleging trademark infringement, dilution and false advertising.

From June 7 through June 10, 1999, a bench trial was held. Plaintiff called as witnesses Shankar Melkote, managing director of Margadarsi Marketing Private Limited, Ushodaya's former exporter and marketing firm, Ananta Mangalampalli, a manager in Ushodaya's export division, Bharat Joshi of Indian Groceries & Spices, Inc., Ushodaya's former U.S. distributor, and Cherukuri Kiron, the managing director of Ushodaya. Defendants presented the testimony of Vel Vasan, Vasudevan's brother-in-law, Bargavi Sundararajan, one of Vasudevan's daughters, Satinder Sharma, a former owner of an Indian grocery store in Chicago, and Aramudh Vasudevan, the individual defendant who is the president and sole employee of the corporate defendant.

After considering all the evidence, observing the demeanor of the witnesses, and considering the plausibility and credibility of the testimony, I conclude that plaintiff has proven its claim of fraudulent procurement of the trademark registrations and a portion of its copyright claim by a preponderance of the credible evidence, but that plaintiff and defendants have both failed to bear their burdens of proving their other claims by a preponderance of the credible evidence. I make the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## THE EVIDENCE

This case concerns what the parties call Indian pickles. Indian pickles consist of pieces of vegetables or fruit, such as mango, garlic or chili peppers, which are steeped in oil, salt and various spices. Pickles are used for flavoring rice in southern Indian cuisine.

### I. Ushodaya's Pickle Sales Prior to 1988

Ushodaya is a company in southern India that was previously incorporated under the name of "Priya Foods Private Limited." It has manufactured pickles with the "Priya" name in India since approximately 1980. (Tr. 30). From 1981 to 1984, Ushodaya sold "Priya" pickles to Margadarsi Marketing Private Limited which in turn exported and marketed the product to the United States and the Arabian Gulf states. (Tr. 22–24). From 1985 to 1987, Ushodaya exported its pickles to the United States through Eswar International, Inc. (Tr. 74). The evidence produced on the volume of sales in the United States comprised (1) receipts dated May 25, 1983 and December 12, 1983 for two shipments of "Priya" pickles from Margadarsi to its agent in the United States, with a total price of $24,510 each, and (2) various invoices and canceled checks dated 1985 and thereafter showing sales of "Priya" pickles by Eswar to Indian Groceries & Spices, Inc., an American wholesale distributor. (Pl.Exs. 77A & 4A).

### II. Vasudevan Family Pickle Production

Beginning in approximately 1972, the wife and eldest daughter of defendant Vasudevan began making lemon and tomato pickles in the basement of their home for their family and friends. (Tr. 309–12). In approximately 1974, the eldest daughter, Marla, began packaging the pickles in ma-

son jars, with typed white labels reading "Priya Pickles, Homemade by Vasudevan Family," for sale by consignment in at least one local Indian grocery store no more than 25 minutes from their home in Chicago. (Tr. 314–15, 329, 341, 379–80). Satinder Sharma, who operated an Indian grocery store in Chicago, testified that Marla delivered one or two dozen jars of pickles "maybe twice a month." (Tr. 378–84). He would pay Marla for each jar of pickles he sold by applying one dollar to reduce the price of the groceries she bought at the store. (Tr. 378, 388, 394).

"Priya" was the nickname of Vasudevan's youngest daughter. (Tr. 317–18, 335). It is a commonly used nickname in India. (Tr. 318). VRS represented to the PTO that the word "priya" means "beauty." [1] (Pl.Ex.89). At trial, Vel Vasan testified that it means "I like it," and derives from the Sanskrit word "priya." (Tr. 316–7).

Sales in Chicago stopped in 1982 when Bargavi, another of Vasudevan's daughters who had been involved in preparing pickles, moved to Altamonte Springs, Florida, where she continued to prepare pickles in her house. (Tr. 319, 326, 331). Vasudevan moved to Florida in approximately 1984, and Bargavi and her father sold the pickles "in small quantities" to "a couple of stores" in the Altamonte Springs area, within a five- to ten-mile radius of their house. (Tr. 397–402, 337). In 1985, Bargavi, Vasudevan and their families moved to Edison, New Jersey, where Vasudevan continued his practice of selling Bargavi's homemade pickles to local stores. (Tr. 397–402). In approximately 1987, Bargavi stopped making pickles. (Tr. 338–39, 401–02).

### III. The Contract Between VRS and Ushodaya

Vasudevan testified that he hoped to continue selling pickles after his daughter stopped preparing them, and to that end he incorporated VRS in New Jersey in February 1988. (Tr. 403). Vasudevan met with Ushodaya in India in March of 1988. (Tr. 415–16). In approximately September 1988, Ushodaya entered into an agreement with VRS. (Tr. 72–77; Pl.Ex. 2). The agreement provided that "[Ushodaya] agrees to appoint VRS as their exclusive dealer/distributor for U.S.A. market only to market PRIYA pickles and chutneys. Further, [Ushodaya] will give first priority to VRS for selling their other products in U.S.A." The agreement also provided that "VRS will keep [Ushodaya] informed of product sales, feedback on competition, market opportunities etc. on quarterly basis," and that Ushodaya "will inform VRS on a continuous basis [of] any changes in the products, packing, etc."

Vasudevan testified that in his meetings prior to signing the agreement, he provided Ushodaya with his family's specifications for the pickles. He suggests that the parties agreed that Ushodaya would change the recipe for its "Priya" pickles to conform to Vasudevan's specifications. (Tr. 416–35). I find that Vasudevan was not credible on this issue. I do credit the testimony of Ananta Mangalampalli, who has worked for Ushodaya since 1988 and is currently the manager of export operations of the export division. (Tr. 69). Mangalampalli testified that at the 1988 meetings he attended with Vasudevan, there was no discussion of a recipe, and that the recipe for the pickles exported to the United States through VRS was the same recipe that Ushodaya had been using previously. (Tr. 79).

Vasudevan advertised and sold Ushodaya's "Priya" pickles in Texas, California, Illinois and New York. (Tr. 448–49).

The distribution agreement between Ushodaya and VRS had an initial term of 16 months commencing on September 1,

---

**1.** At trial, defense counsel clarified that "priya" has this meaning in Telugu, a southern Indian language. (Tr. 9).

1988. Thereafter, the agreement would be automatically renewed for 12-month periods, but it could be terminated on three months' notice by either party. In December 1991, Ushodaya wrote to VRS that "we will continue to supply your requirements" but that discussions about renewal of the agreement should be postponed until Narasimihulu of Ushodaya visited the United States in early 1992. (Def.Ex.LL). In a May 23, 1992 letter, Ushodaya informed VRS that it would no longer supply "Priya" pickles to VRS "since we are establishing our own set-up in the U.S.A." (Pl. Ex.5).

*IV. Trademark Applications*

In August 1991, Vasudevan met with Ushodaya officials to discuss the possibility of VRS registering the "Priya" mark in the United States. (Tr. 97–98). In accordance with the discussion at this meeting, Ushodaya's managing director signed a consent letter, dated August 19, 1991 and addressed to VRS. (Tr. 98–101). The parties produce two different forms of the letter which are substantially the same. Ushodaya's version reads: "We hereby authorize you to register our PRIYA BRAND PICKLES under the Trade Name Registration as Manufacturers and your Name as Trade Mark Holders." (Pl. Ex.9). The version produced by defendants is the same, except that the word "our" is crossed out. (Pl.Ex.9A).

*First Trademark Application.* In September 1991, VRS filed a trademark application signed by Vasudevan for the mark "Priya" for the following goods: "pickles, spices, rice, idly, . . . ." (Pl.Ex. 10; Tr. at 463). In that application, and in accordance with the registration requirements of 15 U.S.C. § 1051(a)(1), Vasudevan stated that he "believes [VRS] to be the owner of the mark sought to be registered", and that "to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce." The application stated that

first use of the mark and first use in commerce were March 1982.

In an "Office action" dated January 9, 1992 and mailed to VRS's attorney, a PTO examining attorney noted deficiencies in VRS's application, and stated that if the application were not "amended" accordingly the application would be deemed abandoned. Among other things, the examining attorney stated that the description of goods was "indefinite." He also stated that "The record indicates that the goods are manufactured in India. The applicant is located in New Jersey." (Pl.Ex.35). He wrote:

"If the referenced manufacturer is only a manufacturer and does not use the mark anywhere as owner, the applicant should state so for the record. That response, by itself, will satisfy this inquiry. However, if the foreign manufacturer uses the mark outside the United States as owner, the applicant must do one of the following to establish ownership and the right to apply in the United States. (1) The applicant must provide a copy of an assignment from the foreign owner to the applicant of all rights in the mark in the United States. . . . (2) The applicant must provide written consent from the foreign owner to the applicant's registration of the mark in the United States."

In a letter to VRS dated February 4, 1992, Ushodaya objected to VRS registering as owners of the trademark: "When we discussed this matter during your last visit to India, our understanding was that you will apply for registration of the Trade Mark on our behalf at the address of . . . VRS, as the holder of PRIYA Trade Mark. We have issued authorization letter to this effect only. Please be advised that we will be the owners of the Trade Mark and you will be the holder of the Trade Mark as our authorized Sole Distributor for U.S. Market." (Pl.Ex.23). The letter demanded that VRS amend the trademark application accordingly.

VRS's attorney responded to the PTO Office action with a letter dated July 9, 1992. (Pl.Ex.89). The attorney submitted the consent letter (the version with "our" crossed out), which he described as "a written consent from the foreign owner to applicant's registration of the mark in the United States." Vasudevan testified that he first sent the letter to his attorney handling the application in November 1991 "[b]ecause originally it slipped somewhere and he said he didn't get it." (Tr. at 463).

However, in the July 9, 1992 submission, VRS's attorney inadvertently failed to amend the description of goods in accordance with the Office action. Therefore, in a letter dated October 18, 1993, the PTO deemed the application abandoned. (Pl. Ex.36). VRS immediately objected, and successfully revived the application.

In the meantime, Ushodaya's U.S. attorneys had sent a letter to the Commissioner of Patents and Trademarks dated June 16, 1992, protesting the trademark application filed by VRS. (Pl.Ex.56). Ultimately, the PTO granted VRS's application and registered the "Priya" trademark on the Principal Register on November 21, 1995. (Def.Ex.A).

*Second Trademark Application.* When the PTO informed VRS that its application was deemed abandoned, VRS attempted to renew the application (which attempt was successful) and also filed a new application for the same "Priya" mark in the same class of goods. (Tr. 573–4). In the new application, VRS represented that the first use of the mark and the first use of the mark in commerce were in 1974. The PTO again requested evidence of an assignment of the trademark or consent from the foreign manufacturer. In a letter dated August 21, 1995 to the PTO, VRS's counsel responded as follows: "Applicant is the owner of the mark in the United States. That claim is supported by the fact that its prior application ... for Priya

has been allowed.... Accordingly, Applicant has already established its right to register the mark in the United States. Accordingly, it would appear that the request for an assignment or consent or acknowledgment of ownership is unnecessary." (Pl.Ex.36). The application was approved, and the mark was listed on the Principal Register on July 16, 1996. (Def.Ex.B).

## V. Post–1991 Sales by Ushodaya and VRS; Copyright Registration

Following termination of the distribution agreement with VRS in early 1992, Ushodaya continued to export "Priya" pickles to the United States through another company. (Tr. 151, 260). VRS continued to import pickle products bearing the "Priya" name, but manufactured by Indian companies other than Ushodaya. (Tr. 471–498). VRS used several different label designs, which resemble to varying degrees the label used by Ushodaya. (Pl.Ex.47(1)–47(6)).

Ushodaya applied for copyright registration of its "Priya" pickle labels with the United States Copyright Office on August 19, 1996. (Pl.Exs. 44, 45; Tr. 132–33). In his trial testimony, Vasudevan asserted that Ushodaya had copied these labels from another Indian pickle manufacturer. (Tr. 491). Defendants did not produce any evidence to support this assertion. I find that Vasudevan's testimony on this issue was not credible.

## VI. Customs Stop

On October 26, 1998, the United States Customs Service issued a notice of detention of Ushodaya's "Priya" pickles. (Pl. Ex.116). Under 19 U.S.C. § 1526(a), it is unlawful to import foreign goods bearing a trademark that is registered by a United States corporation, where a copy of the trademark registration certificate has been filed with the Secretary of the Treasury.[2]

---

**2.** In addition, 15 U.S.C. § 1125(b) provides that "[a]ny goods marked or labeled in con-

travention of the provisions of this section shall not be imported into the United States

Ushodaya has been unable to export "Priya" pickles into the United States since issuance of the notice of detention. (Tr. 134, Pl.Ex.116). The goods subject to the October 26, 1998 notice are presumably still being detained by the Customs Service.

## DISCUSSION

### I. Validity of VRS's Trademark Registrations

The first issue is whether VRS's two trademark registrations are valid.

A district court has the power to order cancelation of a registration pursuant to 15 U.S.C. § 1119. That section provides: "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."

■■■■ Misstatements in registration applications will cause cancelation only if they were made with knowledge of their falsity and if they were material to the decision to grant the registration application. *Gear, Inc. v. L.A. Gear California, Inc.,* 670 F.Supp. 508, 512 (S.D.N.Y.1987), *vacated in part per settlement,* 13 U.S.P.Q.2d 1655 (S.D.N.Y.1989). Fraud must be proven by clear and convincing evidence. *Id.* (citing *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 670 (7th Cir.1982)).

*First Registration Based on Distributorship.* VRS was Ushodaya's exclusive distributor between 1988 and early 1992. I do not believe Vasudevan's testimony that Ushodaya was merely a contract manufacturer producing goods for VRS. Instead, in light of Ushodaya's production and marketing of pickles under the "Priya" name prior to the 1988 agreement between Ushodaya and VRS (in India, the Unites States and elsewhere), the provisions of

or admitted to entry at any customhouse of

that agreement, and the credible testimony of Mangalampalli regarding the negotiation of that agreement, it is clear that VRS was merely the distributor of goods designed and manufactured by Ushodaya. *Cf.* Patent and Trademark Office, Trademark Manual of Examining Procedure ("TMEP") § 1201.05 ("An applicant may claim ownership of a mark when the mark is applied on the applicant's instructions.").

The trademark statute provides that: "The owner of a trademark used in commerce may apply to register his or her trade-mark under this chapter on the principal register established." 15 U.S.C. § 1051(a). The PTO's Trademark Manual of Examining Procedure provides that: "A distributor or importer ... can register the mark only ... [i]f an applicant is the U.S. importer or distribution agent for a foreign manufacturer's mark in the U.S., provided the applicant submits ... (a) written consent from the owner of the mark to registration in the applicant's name, or (b) written agreement or acknowledgment between the parties that the importer or distributor is the owner of the mark in the United States, or (c) an assignment ... to the applicant of the owner's rights in the mark as to the United States together with the business and good will appurtenant thereto." TMEP § 1201.06(a).

Since VRS was applying to register the mark as used on Ushodaya's goods, the only possible basis for its application was VRS's status as Ushodaya's exclusive distributor who had been given consent by the owner of the mark to register in VRS's name. Indeed, Vasudevan requested and received that consent from Ushodaya.

■■ Under these circumstances, VRS made a knowing material misrepresentation to the PTO by submitting the consent letter in July of 1992, since VRS was no longer the distributor of Ushodaya's "Priya" pickles at that time. The distribution agreement was not renewed in 1992, and

the United States."

Ushodaya had informed VRS in May of 1992 that it would no longer supply its "Priya" pickles to VRS. Moreover, in February 1992, Ushodaya had informed VRS that it objected to VRS's applying for trademark registration as owner, and that it consented only to VRS being the "holder" of the trademark as its "authorized Sole Distributor for U.S. Market." (Pl. Ex.23).

VRS argues that it was permitted to submit this consent letter because it "stands alone, pre-dates the application, and need not be accompanied by any ongoing relationship." (Post–Trial Br. 24). However, the PTO Office action of January 1992 expressly required more information for the application to be considered complete, and in fact stated that if the application were not accordingly "amended" the application would be deemed abandoned. Under these circumstances, submission of the consent letter is a representation, as of the time of the submission, that the manufacturer was consenting to registration by its exclusive distributor. This was a false representation in July of 1992. The distributorship was not a valid basis on which to seek registration at that time.

Moreover, as between a foreign manufacturer and its exclusive United States distributor, the foreign manufacturer is presumed to be the owner of the mark unless an agreement between them provides otherwise. *Global Maschinen Gmbh v. Global Banking Sys., Inc.*, 227 U.S.P.Q. 862, 866, 1985 WL 71943 (1985). Accordingly, a somewhat ambiguous consent letter should not be read to cede rights when that letter is submitted after the underlying relationship has ceased. It clearly is not an assignment of the mark and the related good will, which might bind Ushodaya in a situation such as this absent a provision in the agreement to the contrary. *Cf. Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850 (3d Cir. 1986).

The cases cited by defendants on this issue are not on point. For instance, in *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir.1983), the court upheld a preliminary injunction against defendant manufacturer from selling its boats in the United States, where the plaintiff seller had provided the specifications for the boats and the agreement provided that the trademark would be plaintiff's "sole property and would not be used by [manufacturer] ... without [seller's] prior written permission." *Id.* at 1353, 1357.

*VRS's Claim of First Use and the Second Application.* Alternatively, VRS argues that its first and second registrations with the PTO were based not on the distribution agreement, but on the Vasudevan family's first use of the mark.

The Vasudevan family's use of the "Priya" mark in the 1970s and 1980s was very limited and local, and defendants proffered no credible evidence showing that the mark was used in interstate commerce, the "commerce" required by the statute. 15 U.S.C. § 1051 ("owner of a trade-mark used in commerce may apply to register"); 15 U.S.C. § 1127 (" 'commerce' means all commerce which may lawfully be regulated by Congress"); *cf. Larry Harmon Pictures Corp. v. Williams Restaurant Corp.*, 929 F.2d 662, 664–66 (Fed.Cir.1991) (finding single restaurant satisfied "use in commerce" requirement because "the record here established that [restaurant's mark] has been used in connection with services rendered to customers traveling across state boundaries," and distinguishing similar earlier cases where there was no such evidence). It therefore is a serious question whether such use by itself was sufficient to support a registration.

In any event, VRS's claim to own a registered trademark based on first use must fail. As discussed above, in connection with VRS's first application for registration, VRS submitted Ushodaya's written consent which VRS knew was tied to its status as Ushodaya's exclusive distribu-

tor in the United States. This precludes defendants' argument that the Vasudevan family's prior use was an alternative basis for VRS's first application.

Similarly, in light of VRS's awareness of Ushodaya's use of the mark in the United States both prior to, during and after the distributorship of VRS, VRS's second registration based on the Vasudevan family use is also invalid. When Ushodaya informed VRS that it would no longer supply its product to VRS, it also informed VRS that it would continue to ship its "Priya" products to the United States. Accordingly, the verification in the second trademark application that "no other person ... has the right to use such mark in commerce" was knowingly false. That verification is required by statute.[3] *Cf. Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir.1982) (while holding that statute does not impose duty to investigate, knowledge of verifier can support conclusion that verification was made fraudulently; in that case verification was not fraudulent).

Moreover, when the PTO examining attorney inquired about VRS's right to use the mark because the product was made by a foreign manufacturer, VRS's attorney responded by referring to the first application. Since the first amended application was fraudulently premised on an expired distribution agreement, this response was similarly fraudulent and was a deliberate attempt to mislead the PTO. *See Global Maschinen Gmbh v. Global Banking Sys., Inc.*, 227 U.S.P.Q. 862, 867, 1985 WL 71943 (1985) (U.S. distributor's claim of ownership in foreign manufacturer's mark was "fals[e]", and "[m]ore seriously, ... [distributor's] statement in answer to the Examining Attorney's specific request in regard to ownership was recklessly false" and sufficient to support finding of fraud on the PTO).

In light of the foregoing, VRS's federal registrations for the mark "Priya" are void and should be canceled. Whether Ushodaya is entitled to the registration is not clear from the record. Under the facts of this case, that determination is best left to the agency charged with administering the registration system.

## II. VRS's Counterclaim for Trademark Infringement

In support of its counterclaim for trademark infringement, VRS has failed to demonstrate that it is the owner of a federal trademark.

■ The Vasudevan family's sales were of a small volume, local and somewhat sporadic. To establish ownership rights, the use must be deliberate and continuous. *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974). Moreover, if the Vasudevan family had any common law trademark rights prior to the distributorship with Ushodaya, they were only in three distinct geographic areas—the areas centered around Chicago, Altamonte Springs, Florida, and Edison, New Jersey.[4] *See Sutton Cosmetics (P.R.) Inc. v. Lander*

---

3. In an application to the PTO, an officer of the applicant must verify that he "believes ... the ... corporation ... in whose behalf he makes the verification, to be the owner of the mark sought to be registered ... and that no other person, firm, corporation, or association, to the best of his knowledge and belief, has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1051(a)(1)(A).

4. Although Vasudevan testified that, in addition to the federal registrations, VRS registered the trademark "Priya" in New York, New Jersey, Illinois and California (Tr. 502), neither party proffered the applications or registration certificates, and there was no other testimony or evidence of any kind on this issue. Moreover, without information about the dates, there is no reason to believe that this was the Vasudevan family's "Priya" rather than Ushodaya's "Priya." Accordingly, no legal significance can be given to this testimony.

*Co.*, 455 F.2d 285, 288, 289 (2d Cir.1972) (first user, following abandonment of a registered mark, had acquired trademark rights in the areas in which it had used the mark) (citing *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916)). Although federal registration may expand the geographical area of potential protection, *see Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir.1959), VRS's federal registrations are invalid.

■ There is also a serious question of abandonment in two of the three markets prior to the federal registrations. *See Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973) ("we deem it consistent with general principles of trademark law to hold that a user may abandon a trademark in certain states without abandoning it in others"); Restatement (Third) of Unfair Competition § 30, comment a (1995) ("Common law priority in a particular geographic area is ... lost if the designation has been abandoned by the owner in that geographic area."). When Bargavi moved away from Chicago in 1982, the family's practice of selling pickles there ceased. When she moved away from Florida in 1985, the sales in Altamonte Springs similarly ceased. Furthermore, the evidence shows that the Vasudevans did not intend to continue their sales in either Chicago or Altamonte Springs after they moved away from those cities. *See generally* 15 U.S.C. § 1127 ("A mark shall be deemed to be 'abandoned' ... [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from the circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.").

■ The most fundamental problem with defendants' claim of a trademark in "Priya" is that, for approximately four years, from 1988 to 1992, VRS distributed "Priya" pickles that came not from Vasudevan but from Ushodaya. Ushodaya was responsible for the recipe, quality and oth-er attributes of those pickles, and absent any agreement to the contrary, the good will associated with the product belonged to Ushodaya. Similarly, any good will that the Vasudevans had developed in connection with their pickles and their label was effectively lost when VRS began distributing Ushodaya's pickles in lieu of the Vasudevans'. *See generally United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918) ("[a trademark's] function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his ... it is not the subject of property except in connection with an existing business"). By virtue of VRS's own activities, the "Priya" label ceased identifying the source that was identified by the label "Priya Pickles, Homemade by Vasudevan Family."

Moreover, it is probable that the word "Priya" and its format on the bottles sold by VRS beginning in 1988, and the typewritten "Priya Pickles, Homemade by Vasudevan Family" do not create a "continuing commercial impression." *See Van Dyne–Crotty, Inc. v. Wear–Guard Corp.*, 926 F.2d 1156, 1159–60 (Fed.Cir.1991). In that case, VRS is deemed to have abandoned the rights to the previous form and may not assert ownership based on this prior use. *See Pan American World Airways, Inc. v. Panamerican School of Travel, Inc.*, 648 F.Supp. 1026, 1031–32 (S.D.N.Y.1986) (stating the rule). Note that the "fact that two marks may be confusingly similar does not necessarily mean that they are legal equivalents." *Pro–Cuts v. Schilz–Price Enters., Inc.*, 27 U.S.P.Q.2d 1224, 1226–27, 1993 WL 266611 (1993).

### III. Ushodaya's Claim of Trademark Infringement

Like VRS, Ushodaya alleges that it owns the "Priya" trademark and asserts a claim of trademark infringement, under both section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and New York law.

■ Ushodaya has failed to prove that its mark is entitled to legal protection, because it has shown neither that its mark is inherently distinctive nor that it has acquired a secondary meaning in the marketplace. *See Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 143 (2d Cir.1997). Although counsel was pressed on the issue of Ushodaya's entitlement to a trademark and asked to brief the issue during trial, Ushodaya has not addressed the issue of the distinctiveness of the "Priya" mark. The evidence adduced on the meaning of "priya," as well as reference to Indian-language dictionaries, suggests that the word is a laudatory, descriptive mark and is therefore not inherently distinctive. *See Supreme Wine Co. v. American Distilling Co.,* 310 F.2d 888, 889 (2d Cir.1962) ("the word 'supreme' [as used for vodka] is so totally lacking in distinctiveness, originality and uniqueness that, in the absence of compelling proof that it has acquired a secondary meaning to the buying public, it is not entitled to trademark protection"); *In re San Miguel Corp.,* 229 U.S.P.Q. 617, 618, 1986 WL 83670 (1986) ("Selecta" mark, used for beer, is descriptive mark and was properly rejected for registration; English equivalent of the word is "laudatorily descriptive of a quality of applicant's product"); *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 410 (S.D.N.Y.1974) ("[a]s a laudatory word, 'exquisite' per se is entitled to no trademark protection"); *In re Inter–State Oil Co., Inc.,* 219 U.S.P.Q. 1229, 1983 WL 50195 (1983) (affirming refusal of registration of the word "Preferred" for bird and squirrel repellent); *cf. Aveda Corp. v. Evita Marketing. Inc.,* 706 F.Supp. 1419, 1428 (D.Minn.1989) ("Aveda" is not a descriptive mark: it "is not a word in the public domain" because, though based upon the Sanskrit word "ayurveda" meaning the science of herbal remedies, its shortened form was coined by plaintiff; word was used on hair-and skin-care products not marketed specifically to Indian community). Based on the limited evidence presented at the trial, the mark is not entitled to trademark protection in the absence of proof that it has acquired a secondary meaning to the buying public.

Ushodaya proffered no evidence showing that the mark has acquired a secondary meaning. Evidence that Ushodaya has sold pickles for years under the "Priya" label and has engaged in some advertising is insufficient to show that "Priya" for south Indian pickles has acquired a secondary meaning. *Supreme Wine Co.,* 310 F.2d at 890; *Exquisite Form,* 378 F.Supp. at 410–11. Accordingly, Ushodaya has not sustained its burden of showing that it has common law rights in the mark "Priya."

This holding should not be read to suggest that Ushodaya cannot establish an exclusive right to the "Priya" mark in the United States for use on pickles. I hold only that the scant evidence produced at trial on this issue does not sustain a trademark claim.

## IV. The Parties' Claims under New York Law

Because neither party has established that it has a protectable trademark in the word "Priya," the claim and counterclaim alleging "dilution of the distinctive quality of a mark or trade name" under New York law must fail. N.Y.Gen.Bus.Law § 360–1 (McKinney 1996 & 1999).

■ Similarly, neither party has shown that it is entitled to an injunction pursuant to section 133 of the New York General Business Law. While Ushodaya has demonstrated that VRS committed a fraud upon the PTO, it has not shown that VRS, "with intent to deceive or mislead the public," has used a trade name "which may deceive or mislead the public as to [VRS's] identity." N.Y.Gen.Bus.Law § 133 (McKinney 1988). Because neither party has shown that the "Priya" mark distinguishes its goods from other goods in the market, *a fortiori* neither party's use of

the "Priya" mark can deceive or mislead the public as to the source of its pickles.

## V. Claim of Copyright Infringement

Ushodaya also sues for infringement of its copyrighted labels. To establish copyright infringement, two elements must be proven: ownership of a valid copyright, and copying of constituent elements of the work that are original. *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). In the absence of direct evidence, copying is proven by showing (a) access to the copyrighted work and (b) the substantial similarity of protectable material in the two works. *Id.* (quoting *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993)).

To determine whether the protectable elements of a challenged work are substantially similar to those of a copyrighted work, the finder of fact must put herself in the position of an ordinary observer. *Jones v. CBS, Inc.*, 733 F.Supp. 748, 752 (S.D.N.Y.1990). The Second Circuit test is whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Horgan v. Macmillan. Inc.*, 789 F.2d 157, 162 (2d Cir.1986) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960)). The Second Circuit test has also been expressed as "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966).

Ushodaya claims copyright protection for its labels. It is undisputed that the United States Copyright Office registered Ushodaya's claim of copyright in the labels comprising Plaintiff's Exhibit 45 in August 1996. That certificate shows first publication as March 1989. A certificate of registration made within five years after first publication of the work constitutes *prima facie* evidence of the validity of the copyright. 17 U.S.C. § 410(c). The evidentiary weight to be accorded the certificate made after five years is within the court's discretion. *Id.* Other than arguing that the name "Priya" itself cannot be copyrighted (which Ushodaya concedes, *see Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544 (2d Cir.1959)), defendants do not contest that Ushodaya is the owner of a valid copyright. Based on an examination of the labels and the trial testimony, I find that Ushodaya is the owner of a valid copyright in its labels reproduced as Plaintiff's Exhibit 45.

It is undisputed that defendants had access to the copyrighted labels. The only question therefore is whether the protectable material in the two works is substantially similar.

At trial, Ushodaya proffered five bottles sold by VRS that were allegedly produced by companies other than Ushodaya, and for which VRS had allegedly copied the Ushodaya label. The overall appearance of the labels on four of the bottles is not substantially similar to that of Ushodaya's. For instance, the word "Priya" lacks the distinctive design elements that characterize Ushodaya's "Priya." The "Priya" name on the four labels is printed in a simple, *sans* serif typeface, while Ushodaya uses a stylized, serif typeface. One of the most distinctive elements of Ushodaya's label—a heart in place of the dot over the letter "i"—does not appear in the VRS labels.

However, the label on what the parties referred to as bottle number two is substantially similar to Ushodaya's. (Pl. Ex.47(2)). The word "Priya" appears in a small box, in white lettering with a red background, at the top center of the label. This format is the same as the Ushodaya label, even though the sides of the rectangular box protrude outward rather than inward. Moreover, "Priya" on the VRS label appears in a stylized typeface that is very similar to that used by Ushodaya.

The arrangement of the other elements on the labels, including a photograph of green chillies, is nearly identical, and the background color of both labels is yellow. I find that an ordinary observer would be likely to overlook the differences in the labels and would regard their aesthetic appeal as the same.

Accordingly, I find that VRS, by use of the label on bottle number two (Pl. Ex.47(2)), infringed Ushodaya's copyright.

## VI. Damages from the Invalid Registrations

"Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof." 15 U.S.C. § 1120.

■■■ The primary injury caused to Ushodaya by VRS's fraudulent procurement of the trademark registrations was the Customs detention order which prevented it from exporting "Priya" pickles into the United States after October 26, 1998. Its damages are therefore the net profits that it would have earned from "Priya"—pickle exports to the United States but for the Customs exclusion order.

VRS's and Ushodaya's gross U.S. sales of "Priya" pickles following the termination of their distribution agreement are comparable. VRS's gross sales were as follows: 1993—$173,000; 1994—$102,000; 1995—$186,000; 1996—$187,000; 1997—figure not supplied; 1998—$202,000; 1999 (through June 10)—$160,000. (Tr. 594–95). Ushodaya's gross export sales of "Priya" pickles to the United States were as follows: 1993—$60,928; 1994—$116,-512; 1995—$165,980; 1996—$225,715;

1997—$398,527; 1998 (through October 28)—$98,000. (Tr. 151).[5] A fair basis by which to determine the gross sales lost by Ushodaya is VRS's gross sales during the period of the Customs exclusion.

For the year 1998, VRS's gross sales were $202,000. For the portion of the year that Ushodaya was able to export to the United States, its gross sales were $98,000. Ushodaya's lost gross sales for 1998 were thus $104,000.[6] VRS's gross sales for 1999, through June 10, were $160,000. Based on this figure, and in the absence of more precise information, its total sales for 1999 to the date of this Opinion can be projected to be approximately $224,000. Ushodaya's lost gross sales for 1999 were thus $224,000, resulting in total lost gross sales of $328,000.

Cherukuri Kiron, the managing director of Ushodaya, testified that during the period 1989 to 1998, Ushodaya's profit margin from exports to the United States was 25 percent of gross sales, with variations of up to 5 percent. (Tr. 298). He testified that, in 1998, the profit margin was 25 percent. (Tr. 299.) If the 25–percent profit figure is applied, Ushodaya would have earned net profits of $82,000 from the export of "Priya" pickles to the United States during the period of the Customs exclusion.

## VII. Liability of the Individual Defendant

■■■ Where a person, by means of a corporation that he controls, fraudulently procures a trademark registration and thereby injures another corporation, that person is liable for the damages. *Academy Award Products v. Bulova Watch Co., Inc.*, 129 F.Supp. 780, 784 (S.D.N.Y.1955). A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when

---

5. The record includes complete figures from both companies for four years, 1993–1996. Over those years, VRS's average gross sales were $162,000 and Ushodaya's were $142,-283.75.

6. In lieu of pro-rating, I have assumed that the total 1998 sales for VRS and Ushodaya would have been the same.

he is an actual participant in the tort. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978). The authorities cited by Vasudevan do not support his position that he cannot be held individually liable.[7]

■ A preponderance of the credible evidence shows that Vasudevan made the decisions relating to the trademark applications, including the decision to continue to pursue the first application after the PTO sought additional information about VRS's relationship with the manufacturer. It was Vasudevan who made the false verification in the trademark applications that he knew of no other person who had the right to use the mark. His participation in the fraudulent conduct is also clear from the fact testified to by his daughter that he personally conducted all of the activities of the corporation. Accordingly, Vasudevan is personally liable for the damages caused by his and VRS's fraud on the PTO.

## CONCLUSION

In light of these findings of fact and conclusions of law, plaintiff is directed to identify the evidence at trial that establishes the required causal relationship between defendants' copyright infringement (consisting of their use of the label on bottle number two) and damages to the plaintiff, and whether plaintiff elects statutory damages under 17 U.S.C. § 504. In either event, plaintiff is directed to identify the basis in the trial record for calculating damages for copyright infringement in this case. With respect to plaintiff's application for attorney's fees, plaintiff is directed to submit the legal authority on which it relies in light of these findings of fact and conclusions of law. Plaintiff's submissions are due by August 30, 1999.

7. He cites *Walkovszky v. Carlton*, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966), which held that a complaint, alleging a personal injury tort claim arising from a traffic accident, failed to state a claim against the individual owner of the corporation that owned the implicated taxi cab. That case

The Patent and Trademark Office is directed to cancel VRS's two registrations for the "Priya" mark (Reg. No. 1,936,261, registered November 21, 1995, and Reg. No. 1,986,550, registered July 16, 1996). The United States Customs Service is directed to vacate its order prohibiting importation of Ushodaya's "Priya" pickles and to vacate the detention of Ushodaya's "Priya" pickles which was noticed on October 26, 1998.

SO ORDERED.

deals with the issue of when the "corporate veil" can be "pierced," and has nothing to do with the issue of a corporate officer's liability for his own tortious conduct. New York Business Corporation Law § 715, cited by Vasudevan, is also not applicable.