PILATES, INC., Plaintiff,

v.

CURRENT CONCEPTS, INC.
and Kenneth Endelman,
Defendants.

No. 96 Civ. 43 MGC.

United States District Court,
S.D. New York.

Oct. 19, 2000.

Kenneth L. Bressler, New York, NY, for Plaintiff.

Andrew Multer, Larry B. Miller, New York, NY, for Plaintiff.

Gordon E.R. Troy, PC, Charlotte, VT, By: Gordon E.R. Troy, Lawrence A. Stanley, for Defendants.

Robert Fogelnest, New York, NY, By: Robert Fogelnest, Tama Kudman, for Defendants.

## OPINION

CEDARBAUM, District Judge.

Plaintiff Pilates, Inc. sues defendants Current Concepts, Inc. and Kenneth Endelman for infringing two of plaintiff's registered trademarks in the word PILATES. One mark is registered for certain types of equipment used in the "Pilates method" of exercise. The other mark is registered for use in connection with exercise instruction services. Plaintiff seeks only declaratory and injunctive relief. A bench trial was held from June 5 to June 26, 2000.

Because defendants did not contest infringement, the central issue at trial was the validity of plaintiff's marks. Defendants asserted, in essence, six defenses to plaintiff's claim of infringement: (1) the marks are generic; (2) the marks were abandoned; (3) the marks were improperly assigned in gross; (4) the marks were registered fraudulently; (5) defendants are prior users of the marks; and (6) plaintiff's claims are barred by the doctrine of "unclean hands."

After considering all the evidence, observing the demeanor of the witnesses, and considering the plausibility and credibility of the testimony, I conclude that defen-

dants have proven by clear and convincing evidence that: (1) both of the marks at issue are generic; (2) if there ever was a PILATES equipment trademark, it had been abandoned long before plaintiff applied for its registration, and its registration was obtained by plaintiff through fraud; and (3) the exercise instruction service mark was invalidly assigned in gross. The following shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## BACKGROUND

### I. The Parties

Plaintiff Pilates, Inc. is a Montana corporation with offices at 890 Broadway and 2121 Broadway in New York City. Plaintiff's business includes providing instruction in the Pilates method of exercise, training Pilates instructors, and selling Pilates equipment and merchandise. Pilates, Inc. is the registered holder of the trademarks at issue in this suit. Sean Gallagher is the President and sole shareholder of Pilates, Inc.

Defendant Current Concepts, Inc. is a California corporation with its main office in Sacramento, California.[1] Defendant Kenneth Endelman is President of Current Concepts and owns 50% of its shares.

### II. The Trademarks

■ Two trademarks are at issue in this case.[2] PILATES, U.S. Registration No.

---

1. Current Concepts has been doing business as "Balanced Body" for several years. Current Concepts formally changed its name to Balanced Body, Inc. in 1999. For convenience, and because Endelman's business was known as Current Concepts during most of the relevant years in this case, this defendant will be referred to as Current Concepts throughout the opinion.

2. Defendants also challenge the mark PILATES STUDIO, which was registered by Healite, Inc. on June 19, 1990 for "providing facilities for exercise and physical conditioning." However, defendants lack standing to contest this mark. Endelman admits that

his business has never used the name PILATES STUDIO. There is no evidence that defendants intend to use the PILATES STUDIO mark. Moreover, plaintiff is not suing defendants for infringing the PILATES STUDIO mark. There is thus no justiciable case or controversy with respect to the PILATES STUDIO mark. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (standing requires injury which is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'") (citations omitted); *Berni v. Int'l Gourmet Restaurants of America, Inc.*, 838 F.2d 642, 648 (2d Cir.

1,405,304, was registered by Aris Isotoner Gloves, Inc. on August 12, 1986 for "exercise instruction services" (the "PILATES service mark"). PILATES, Registration No. 1,907,447, was registered by plaintiff on July 25, 1995 for "exercise equipment, namely reformers, exercise chairs, trapeze tables, resistance exercise units and spring actuated exercise units" (the "PILATES equipment mark").[3]

It is undisputed that the PILATES service mark is incontestable. *See* 15 U.S.C. § 1065. The PILATES equipment mark is contestable. Both marks are in full force and effect on the Principal Register.

### III. Events During the Lifetime of Joseph Pilates

Joseph Humbertus Pilates was born in Germany in 1880. Starting in or around 1914, when Mr. Pilates was interned in England with other German nationals during World War I, he developed a method of conditioning incorporating specific exercises designed to strengthen the entire body, with emphasis on the lower back and abdominal region, while at the same time enhancing flexibility. Mr. Pilates developed numerous pieces of equipment for use in connection with his method of conditioning. Most of these pieces of equipment utilize springs to provide some form of resistance against which the person performing the exercises can work. The most prominent among these pieces of equipment are the "reformer," the "Cadillac" (also known as a "trap table"), the "Wunda Chair," and various "barrels," one of which is referred to as a "spine corrector."

In the mid–1920s, Mr. Pilates and his wife, Clara, emigrated to the United States. They moved into an apartment at 939 Eighth Avenue in New York City and opened an adjoining studio at which they provided training in the method of exercise Mr. Pilates had developed. During Mr. Pilates' lifetime, his method of conditioning, which he sometimes called "contrology," gained a positive reputation in the New York City dance community.

In 1941, Romana Kryzanowska, then a dancer in George Balanchine's dance company, was referred to Mr. and Mrs. Pilates for rehabilitation of an ankle injury. At that time, the studio had a glass door which read, in black ink, "Contrology—Art of Control—Pilates Studio—Joseph Pilates," with each of these four terms on descending levels. Kryzanowska trained and studied with Mr. and Mrs. Pilates until 1944, when she married and moved to Peru. Kryzanowska lived in Peru until 1959.

Between 1927 and 1951, Mr. Pilates obtained patents for several of the pieces of exercise equipment he invented. He placed metal plaques on his equipment to identify the name of the apparatus and the patent number. For example, one plaque identified the PILATES UNIVERSAL REFORMER as made by PILATES STUDIOS OF CONTROLOGY.

After 1959, the studio became less active because the condition of the building deteriorated and the neighborhood became more dangerous.

Throughout his lifetime, Mr. Pilates promoted his method of exercise and attempted to increase its use by the public. For example, as Kryzanowska related, "[Mr. Pilates] wanted all colleges mainly to have this exercise program because he thoroughly believed in it and thought it would be good for the human race and even children in schools." Mr. and Mrs. Pilates never did anything to prevent others from using their name to describe what they taught.

---

1988); *Houbigant, Inc. v. ACB Mercantile, Inc.*, 914 F.Supp. 997, 1002 (S.D.N.Y.1996).

**3.** The PILATES service mark and PILATES STUDIO mark were originally registered in 1982, but the registrations lapsed. Defendants do not argue that these lapses have any impact on the validity of the marks.

In 1965, Mr. Pilates opened a studio in the beauty salon at Henri Bendel, a department store in New York City, at which his method of conditioning was taught. Naja Corey, who had been trained by Mr. Pilates, was the instructor at the Bendel facility until 1972. Corey was succeeded by Kathleen Grant, who had also been trained by Mr. Pilates. The Bendel store directory included a sign for "Pilates Studios." Grant worked at the Bendel facility until it closed in 1988.

While Mr. Pilates was alive, he taught a number of students who went on to become Pilates instructors themselves. Among these students were Bruce King, Carola Trier, Bob Steed, Naja Corey, Kathy Grant, Ron Fletcher, and Eve Gentry.

Mr. Pilates died in 1967. He did not leave a will.

## IV. 1967 to 1984: 939 Studio Corporation and Pilates Studio, Inc.

After Mr. Pilates' death, Clara Pilates continued to teach at and run the studio until 1970.

Mrs. Pilates was represented by John Steel, an attorney, beginning in or around 1970 and continuing until her death. Steel was also a Pilates student and close friend of Mr. and Mrs. Pilates. On March 3, 1970, Steel formed a New York corporation called 939 Studio Corporation ("939 Studio") whose purpose was to own and operate the studio at which Mr. and Mrs. Pilates had taught and provide support for Mrs. Pilates. In September 1971, Steel formed a limited partnership between 939 Studio and approximately 20 investors who wished to keep the studio open. 939 Studio was the general partner and the investors were limited partners. The limited partnership purchased the assets of her studio from Mrs. Pilates. At some point during this period, Kryzanowska

agreed to take over the responsibilities of running the studio.

In or around 1972, the studio moved from 939 Eighth Avenue to 29 West 56th Street in New York City. After the move, the studio gained more clients.

On June 4, 1973, 939 Studio changed its name to Pilates Studio, Inc. (the "first Pilates Studio, Inc.")[4] That same year, Kryzanowska became a 50% shareholder of the first Pilates Studio, Inc. The remaining shares were owned by the limited partners of 939 Studio. Clara Pilates died in 1976.

The State University of New York at Purchase ("SUNY Purchase") maintained a facility from 1975 through 1990 at which students received instruction in the Pilates method. SUNY Purchase never paid anyone for its use of the name "Pilates Studio at SUNY Purchase."

During the 1970s, Kryzanowska facilitated the sale of Pilates equipment by a manufacturer named Donald Gratz to some of her students. Kryzanowska forwarded orders and payments from the buyers to Gratz, and Gratz would then ship or directly deliver the equipment to the buyers. Kryzanowska sometimes added an extra amount to the price as compensation for her participation in the transactions. Buyers sometimes ordered directly from Gratz rather than through Kryzanowska. The first Pilates Studio, Inc. never manufactured equipment itself, nor did it license anyone to manufacture equipment. Before her death, Clara Pilates gave Mr. Pilates' original equipment blueprints to Ron Fletcher for Fletcher's use in having equipment built in California.

Also starting during the 1970s, Kryzanowska trained people to teach the Pilates method, although there was no formal certification program. Sometimes Kryzanowska provided a letter of recommenda-

---

**4.** This terminology is used to avoid confusion. The "first Pilates Studio, Inc." will be used to refer to the renamed 939 Studio, while the "second Pilates Studio, Inc." will be used to refer to the corporation operated by Healite, Inc. in the late 1980s. The "Pilates Studio" will be used to refer to the name of a particular studio location with that name.

tion to students who intended to teach Pilates on their own.

The first Pilates Studio, Inc. initiated a few lawsuits and sent some cease and desist letters in the early 1980s.

During the 1970s, defendant Endelman became involved in manufacturing Pilates equipment. Prior to 1975, Endelman conducted a furniture business located in Los Angeles, California. Current Concepts first existed as a furniture design business and was established in or around 1974.

Endelman first learned of the Pilates method and of the equipment Mr. Pilates had invented in late 1975 or early 1976 when a client asked him to manufacture a reformer. In 1976 or 1977, Current Concepts started to manufacture equipment for use with the Pilates method. Current Concepts moved to Sacramento, California in 1980 and has operated there continuously since that time.

### V. 1984 to 1986: Aris Isotoner

In 1984, the first Pilates Studio Inc.'s assets were sold to Aris Isotoner Gloves, Inc. ("Aris Isotoner"). Aris Isotoner's then-president and CEO, Lari Stanton, was a student of Kryzanowska's who wanted the studio to survive despite its financial difficulties.

Aris Isotoner bought all of the studio's assets in an agreement dated August 14, 1984. A separate assignment of the studio's trademarks was executed on September 24, 1984. The assignment from the first Pilates Studio, Inc. to Aris Isotoner provided for the transfer of the service marks PILATES and PILATES STUDIO and the trademark MAGIC CIRCLE, along with the trade names PILATES, PILATES STUDIO and PILATES STUDIOS. The assignment did not mention a trademark for equipment.

Kryzanowska continued to teach at the studio as an employee of Aris Isotoner. She continued to give letters of recommendation to students whom she trained to teach Pilates.

During these years, Aris Isotoner listed its exercise business in the Manhattan telephone directory as "Isotoner Fitness Center." This name was also used in advertisements for the studio.

Aris Isotoner never manufactured Pilates equipment or provided a license to anyone to manufacture such equipment. Kryzanowska continued to facilitate the sale of equipment while working for Aris Isotoner.

Aris Isotoner sent some cease and desist letters and settled a trademark infringement lawsuit relating to the PILATES marks during this period. Aris Isotoner never licensed any of the PILATES marks.

Because the studio was losing money and Lari Stanton was unable adequately to manage both the studio and Aris Isotoner's other business simultaneously, Stanton decided to sell the assets of the studio.

### VI. 1986 to 1992: Healite

#### A. 1986 to 1989: Healite Operates The Pilates Studio

On December 30, 1986, Aris Isotoner transferred all assets related to its Pilates business to Healite, Inc. for $15,000. Healite Inc. was wholly-owned and operated by Wee–Tai Hom, a student of Kryzanowska. A separate assignment of the trademarks was executed on the same day. The assignment named the same marks as those described in the assignment to Aris Isotoner. No equipment trademark was mentioned.

Healite moved the Pilates Studio to a new location at 160 East 56th Street in New York City. On January 6, 1987, Healite incorporated a new Pilates Studio, Inc. The second Pilates Studio, Inc. was a wholly-owned subsidiary of Healite.

Kryzanowska continued to teach at the Pilates Studio. Kryzanowska and Hom implemented a more formalized training program for Pilates teachers. They issued certificates to instructors who had com-

pleted the Pilates teacher training program.

Hom sold some Magic Circles to individuals in California. He also placed at least one magazine advertisement on behalf of his business.

### B. 1989 to 1992: Closing Of The Studio

Healite was unable to make the Pilates Studio into a financial success. The studio was losing money and could not pay its rent. On April 1, 1989, Healite's financial difficulties resulted in the closing of the East 56th Street studio, Healite's only studio. On that day, upon their arrival at the studio the studio's instructors and clients found the studio closed and the door locked.

Wee–Tai Hom immediately sent the studio's clients a letter referring them to Body Art, Sichel Chiropractic, and The Gym.[5] The letter was printed on Body Art stationery, although Hom signed as President of Pilates Studio, Inc. Hom created a schedule for the instructors who used to work at the East 56th Street location, assigning them to specific times at either Body Art or The Gym. Hom received one or two dollars as a referral fee for each client served at the three locations.

Hom distributed some cards advertising the three locations. Hom also distributed in person and by mail a number of fliers advertising a piece of equipment called the "Pilates Exerciser" and promoting the Pilates method. The fliers refer to Healite and the Pilates Studio. It is not clear when these materials were distributed.

Hom sold some equipment and books in July of 1989. Hom also placed some advertisements in *Dance* magazine during 1990 and 1991. The advertisements included a toll-free telephone number which rang in Hom's home. Hom was billed personally for these advertisements.

Used equipment from the East 56th Street Studio was distributed among three locations in New York City: Sichel Chiro-practic, Body Art Exercise Ltd. ("Body Art"), and The Gym. Healite did not open another facility at which the Pilates method was taught.

On May 10, 1991, the owner of The Gym, Dragutin Mehandzic ("Drago"), paid Hom $3000 for all of the equipment Hom had moved there when the East 56th Street studio closed in 1989. Between 1989 and 1991, Drago had paid Hom one to two dollars for each customer Hom referred to The Gym. The Gym never had any licensing agreement or other payment arrangement with Healite or the second Pilates Studio, Inc.

Hom engaged in a number of sporadic Pilates-related activities on his own behalf. He gave a lecture at the International Ballet Festival in Jackson, Mississippi in 1990 and he taught a Pilates course at New York University in 1990.

Hom certified a student in February, 1990, signing as "president" of an unspecified business. He approached a few people regarding selling the Pilates marks, including defendants. As a substitute for returning $300, he volunteered a one-year license to Amy and Rachel Taylor to use the Pilates name in connection with their studio in Colorado.

Neither Healite nor the second Pilates Studio, Inc. filed any federal income tax returns from 1988 through 1993.

After April 1, 1989, Kryzanowska taught Pilates at The Gym, where she continues to teach today. She also taught at Body Art for a few months.

During this period, Sean Gallagher, who would later form plaintiff Pilates, Inc., was engaged in a separate Pilates-oriented business. In 1990, Gallagher and Steve Giordano formed Synergy Exercises Systems ("Synergy"). Gallagher and Giordano also established "The Pilates Guild" in or around 1990. Synergy provided Pilates exercise instruction services, set up studios to teach the Pilates method, and sold Pi-

---

**5.** "The Gym" later came to be known as "Drago's."

lates equipment. Synergy did not have a license to use the words "Pilates," "Pilates method," or "Pilates-based."

## VII. 1992 to Present: Plaintiff Purchases And Polices The PILATES Marks

Sean Gallagher acquired the trademark registrations for the PILATES service mark and PILATES STUDIO for $17,000 under an asset purchase agreement effective August 3, 1992.[6] The agreement did not mention a trademark for equipment. Moreover, Healite represented in the agreement that "[e]xcept for the [marks listed], Healite presently owns no other mark containing the word 'Pilates' or referencing 'Pilates' in any manner." Gallagher also acquired the studio's archives, which included photographs, business records, books, films, and other documents dating back as early as the 1940s. Gallagher destroyed eighty percent of the papers he received. Gallagher also acquired client lists, which he threw away within a year.

Gallagher incorporated Pilates, Inc. in 1992. In June 1994, Gallagher assigned the Pilates marks to Pilates, Inc.

On September 25, 1992, Gallagher applied for a trademark registration for PILATES for use on exercise equipment. The application was denied in March 1994. Gallagher eventually obtained registration for a PILATES equipment mark.

In 1993, plaintiff began to develop a formal teacher certification program headed by Kryzanowska. Kryzanowska was, and is, an independent contractor. Plaintiff grants certified instructors a license to use its PILATES marks in specified fashions. Plaintiff currently has license agreements with approximately 450 instructors.

Shortly after purchasing the PILATES marks, plaintiff had an arrangement with defendants under which defendants manufactured Pilates equipment and sold it to plaintiff for resale. The arrangement was of short duration.

Starting in 1996 or 1997, plaintiff entered into a licensing agreement with Stamina Products. Under this agreement, Stamina sells Pilates equipment through mass market outlets, including the QVC network, to consumers who have not been trained in the Pilates method. Stamina's best-selling Pilates product has been the "Pilates Performer." The majority of plaintiff's revenue comes from its licensing agreement with Stamina.

Plaintiff has vigorously enforced the PILATES marks since it acquired them. Plaintiff has sent hundreds of cease and desist letters to purported infringers and has sued for trademark infringement in several other cases. One of those actions resulted in a settlement between plaintiff and the Joseph H. Pilates Foundation for Physical Fitness, a non-profit corporation operated by Endelman.

Plaintiff currently operates studios in New York, Chicago, Atlanta, Philadelphia, Seattle, and Brazil.

## VIII. History Of This Action

Plaintiff filed a complaint against Current Concepts and Endelman in 1996 alleging three claims of trademark infringement and unfair competition and seeking declaratory and injunctive relief. Plaintiff filed an amended complaint later that year adding a claim for false designation of origin.

Defendants asserted numerous affirmative defenses and four counterclaims in their answer and named as counterclaim defendants Sean Gallagher, The Pilates Studio, The Pilates Guild, and Performing Arts Physical Therapy. Defendants also filed a class action complaint against those same entities seeking cancellation of plaintiff's marks and unspecified damages.

Plaintiff did not oppose class certification. I certified the class. However, I

---

**6.** Gallagher paid $6000 to Hom personally and $9000 to Hom's lawyers with "for Healite" noted on the check. He paid the remaining $2000 in cash.

decertified the class with the consent of counsel for both sides for reasons stated on the record at the final pretrial conference. (Transcript of Proceedings, May 31, 2000, at 2–10.) I also dismissed all of defendants' counterclaims for lack of supplemental jurisdiction.[7] I allowed defendants to maintain on their own behalf the class action claims seeking cancellation of plaintiff's marks pursuant to 15 U.S.C. § 1119.[8]

An eleven day bench trial was held in June, 2000.

## DISCUSSION

### I. Burden of Proof

The parties are in agreement that defendants bear the burden of proving each of the defenses asserted in this action. The parties also agree that defendants' fraud defense must be proven by clear and convincing evidence. *See Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir.1988); *Ushodaya Enter., Ltd. v. V.R.S. Int'l, Inc.*, 63 F.Supp.2d 329, 335 (S.D.N.Y.1999). However, the parties are in disagreement concerning the proper standard of proof for defendants' genericness and abandonment defenses. Plaintiff argues that these defenses must be proven by clear and convincing evidence, while defendants argue that a preponderance of the evidence standard is applicable.

■ In a handful of cases, the Court of Appeals has explained that a higher standard of proof is applicable to a defense of abandonment. *See Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) ("[A]bandonment, being a forfeiture of a property interest, should be strictly proved, and the statutory aid to such proof should be narrowly construed.") (citation omitted); *Warner Bros. Inc. v.*

*Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir.1983) (requiring a "high burden of proof" to show abandonment of a trademark). A number of district courts have interpreted these cases as holding that a clear and convincing standard is applicable to the defense of abandonment. *See McKay v. Mad Murphy's, Inc.*, 899 F.Supp. 872, 878 n. 5 (D.Conn.1995) (explaining that, with respect to an abandonment defense, the preponderance of the evidence standard "is the minority view of the Circuits and is not followed in the Second Circuit"); *EH Yacht, LLC v. Egg Harbor, LLC*, 84 F.Supp.2d 556, 564–65 (D.N.J.2000) (explaining that a majority of courts have held that abandonment must be proven by clear and convincing evidence). *See also General Cigar Co. v. G.D.M. Inc.*, 988 F.Supp. 647, 658 (S.D.N.Y.1997) (RWS) (abandonment must be "strictly proved"); *Frankel v. Central Moving & Storage Co.*, No. 95 Civ. 6330, 1997 WL 672003, at *3 (S.D.N.Y. Oct. 29, 1997)(BN) (abandonment is "a forfeiture which must be strictly proven"); *Warner–Lambert Co. v. Schick U.S.A., Inc.*, 935 F.Supp. 130, 143 (D.Conn.1996) (party asserting abandonment has a "high burden of proof"). In light of this authority, defendants' defense of abandonment must be proven by clear and convincing evidence.

In contrast, no decision within the Second Circuit requires "strict proof" or a "higher standard" for proving genericness. Decisions from other circuits expressly hold that a preponderance of the evidence standard is applicable to a genericness defense. *See Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir.1996) (presumption of validity can be overcome with showing by a preponderance of the evidence that a mark has become generic); *Anti–Monopoly, Inc.*

---

7. Defendants' counterclaim for trade disparagement was dismissed pursuant to a stipulation among the parties earlier in the case.

8. 15 U.S.C. § 1119 provides: "In any action involving a registered mark the court may

determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."

v. *General Mills Fun Group, Inc.,* 684 F.2d 1316, 1319 (9th Cir.1982) (same).

Since I find that defendants have proven their genericness defense by clear and convincing evidence, it is unnecessary to decide whether a preponderance of the evidence would be sufficient.

## II. Infringement

Defendants do not dispute that if the PILATES marks are valid, they were infringed.[9]

For example, defendants placed a number of advertisements in print media that infringed the PILATES marks. In advertisements, defendants provided the telephone number "1–800–PILATES" for readers seeking more information. A 1992 *Shape* magazine advertisement reads, "The Pilates body. Get yours at a body conditioning studio near you," and lists a number of "Pilates-based fitness studios" to be contacted for more information.[10] Defendants have continued through April 2000 to place in numerous other publications advertisements prominently featuring the term PILATES.

Defendants have also infringed plaintiff's marks in brochures and other publications by Current Concepts. One brochure which predates this lawsuit includes the "1–800–PILATES" telephone number. Balanced Body's 1998 and 1999 brochures feature the words "Finely crafted Pilates equipment" in large print on the cover, with the word "Pilates" in reverse type surrounded by a block of dark color.

Plaintiff provided other evidence of infringement which will not be discussed in detail, such as infringement through the use of Internet domain names including PILATES, and infringement through the production, marketing, and distribution of video tapes that are described as PILATES videos.

Defendants have infringed the PILATES equipment and service marks.

## III. Genericness

### A. Applicable Law

A trademark or service mark that becomes generic is no longer entitled to protection. *Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Generic marks are subject to cancellation at any time. *Park 'n Fly,* 469 U.S. at 194, 105 S.Ct. at 661. A generic mark lacks protection even if it is incontestable. *Id.* at 195, 105 S.Ct. at 662.

A generic mark "is one that refers to the genus of which the particular product is a species." *Park 'n Fly,* 469 U.S. at 194, 105 S.Ct. at 661. However, a mark is not generic when "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *see also* 15 U.S.C. § 1064(3).[11]

---

**9.** During the trial, plaintiff also stated on numerous occasions that it was asserting a claim for false advertising under the Lanham Act based on allegedly inaccurate identifications by defendants of Current Concepts equipment as Pilates equipment. However, this claim is found neither in the complaint nor in the joint pretrial order. Plaintiff has not addressed this claim in its post-trial submissions. Accordingly, plaintiff's false advertising claim has been abandoned, to the extent that it was ever properly asserted at all.

**10.** Plaintiff still has not made clear whether it claims that use of the term "Pilates-based" by itself is an infringement of plaintiff's marks.

*Compare* Pl. Mem. at 10 (use of term "Pilates-based" creates confusion among consumers) *with* Pl. Ans. Mem. at 21 (referring to equipment or services as "Pilates-based" is not infringement).

**11.** 15 U.S.C. § 1064(3) provides: "A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service. The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the

This is so because "[t]he purpose of a mark is to identify the source of [goods or services] to prospective consumers." *Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192 F.3d 337, 343–44 (2d Cir.1999).

■ Types of evidence to be considered in determining whether a mark is generic include: (1) dictionary definitions; (2) generic use of the term by competitors and other persons in the trade; (3) plaintiff's own generic use; (4) generic use in the media; and (5) consumer surveys. *See Brandwynne v. Combe Int'l Ltd.*, 74 F.Supp.2d 364, 381 (S.D.N.Y.1999). In addition to these factors, it is necessary to determine whether there are commonly used alternative means to describe the product or service. *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 144 (2d Cir.1997); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 305–06 (3d Cir.1986).

B. Evidence of Genericness

1. Dictionary Definitions

■ Dictionary definitions, while not conclusive, reflect the general public's perception of a mark's meaning and are thus helpful in determining whether a term is generic. *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989).

The *Random House Webster's College Dictionary* defines "Pilates" as follows:

> Pilates (pi lä' tez). *Trademark.* a system of physical conditioning involving low-impact exercises and stretches, performed on special equipment. Also called *Pila'tes meth'od.*

*Random House Webster's College Dictionary* 1000 (2d ed.1999).

Plaintiff objects to this definition on the ground that the definition indicates that Pilates is a trademark. However, as the dictionary's editors explain, an acknowledgment that a term may be trademarked does not show that the term's primary

generic name of goods or services on or in

significance is to indicate a source of a product or service:

> A number of entered words which we have reason to believe constitute trademarks have been designated as such. However, no attempt has been made to designate as trademarks or service marks all words or terms in which proprietary rights might exist. The inclusion, exclusion or definition of a word or term is not intended to affect, or to express a judgment on, the validity or legal status of the word or term as a trademark, service mark, or other proprietary term.

*Id.* at iv.

Moreover, the dictionary's publishers include the term Pilates on the dust jacket in a listing of new words, along with words like "FAQ," "road rage," "smoothie," and "index fund." The dictionary's publishers explain why these new words were added:

> The sources of new words and meanings are manifold. They include news items and articles in newspapers and magazines, books and CD–ROMS, plays and movies, television and radio, and the texts of electronic databases like NEXIS and LEXIS.... Editors periodically review the citations and select from them those items that show sufficient currency and importance to be recorded in the dictionary.... Physical fitness and body building are movements that since the 1960s have enlisted the enthusiasm of millions, producing a host of new words, including aerobics, dancercize, jazzercise, Exercycle, Pilates, step aerobics, abs, delts, lats, and glutes.

*Id.* at xxiv-xxv.

This dictionary use is generic because it identifies Pilates as a method of exercise. Accordingly, this factor weighs in favor of genericness.

2. Use By Competitors And Persons In The Trade

■ Generic use of a term by a trademark holder's competitors weighs in favor

connection with which it has been used."

of genericness. Generic use by competitors which the trademark holder has not challenged strongly supports a finding of genericness. However, the lack of use of the mark by other suppliers of the same product or service does not weigh against genericness where the holder of the registered mark polices it in such a manner as to deter others from using the term in describing their products or services. *Murphy Door Bed*, 874 F.2d at 101 n. 2.

Romana Kryzanowska identified at least two dozen individuals who use, or have used, the term Pilates to describe their services. Kryzanowska explained that these people were trained in the Pilates method, then "scattered" around the United States and not only called what they taught Pilates but trained new instructors who themselves called what they taught "Pilates." Ron Fletcher, another former student of Mr. Pilates, also identified a number of individuals who described what they taught as "Pilates." He explained that over the years he met with other Pilates practitioners and visited other facilities where the exercises were taught, and that the exercises and method in general were referred to as "Pilates." Ron Fletcher also sold equipment with plaques attached containing the name "Pilates."

Kathy Grant, another former student of Mr. Pilates, has taught Pilates since the 1960s and has used no other name to describe what she teaches. She has taught Pilates to hundreds of NYU students and has always identified what she taught to them as "Pilates." She has also trained Pilates teachers who have gone on to call what they taught "Pilates." Grant has never paid a licensing fee to use the word Pilates in connection with her teaching. Nor has she ever sought authorization for calling her courses "Pilates."

Amy Taylor studied with and was certified by Kryzanowska. When she later moved to Boulder, Colorado to open her own studio, she was aware of approximately twelve teachers in the area who called what they taught "Pilates." Since 1990, Taylor has run the Pilates Center in Boulder, offering Pilates training and teacher certification. Taylor identified at least ten other individuals or organizations that certify teachers in the Pilates method. The Pilates Center alone has certified approximately 110 people. Taylor is aware of at least five manufacturers of Pilates equipment in addition to Current Concepts.

Other witnesses [12] credibly identified numerous individuals and businesses that teach Pilates, train Pilates instructors, and sell Pilates equipment. All of these witnesses testified that they have no way to describe what they teach other than the word "Pilates." All of these witnesses together have trained hundreds of individuals in the Pilates method.

Plaintiff makes two responses to this evidence. First, plaintiff points out that some of the witnesses identified above have either been sued or sent cease and desist letters by plaintiff. However, witnesses such as Kathy Grant and Donald Gratz have not been challenged by plaintiff despite prominent use of the Pilates name over many years. Moreover, witnesses identified many other businesses and individuals offering Pilates services and equipment, and plaintiff provides no evidence that it has challenged all or even most of them. Accordingly, this objection only slightly reduces the weight of this evidence.

Second, plaintiff argues that these witnesses showed that there are many other names to describe body conditioning exercise instruction services that are similar to but distinct from PILATES, such as the Ron Fletcher Work, IMAX, Spiralfitness, Core Dynamics, Corfitness, The Well–Tempered Workout, Body Moves, and Universal Reformer Technique. However,

12. Among these witnesses were Hila Paldi; Donald Gratz; Carol Appel; Brent Anderson; Mary Sue Corrado; Dr. James Garrick; Jillian Hessel; Quentin Josephy; Michelle Larsson; and Pat Guyton.

this does not undercut the credible and voluminous testimony that there is no other way that is commonly understood to describe Pilates exercises. Moreover, the evidence shows that many of these alternative names were developed in response to threats of litigation, which does not weigh against genericness. *See Murphy Door Bed,* 874 F.2d at 101 n. 2. This objection has little impact on the strength of this evidence.

Accordingly, the use of the word Pilates by competitors and other persons in the trade weighs strongly in favor of genericness.

### 3. Plaintiff's Use

■ A plaintiff's own generic use of its marks supports a finding of genericness, as does generic use by plaintiff's claimed predecessors.

There is no evidence that Mr. Pilates intended to prevent the use of his name in connection with services and equipment relating to his method of exercise. John Steel, the Pilates' friend and lawyer, testified that Mr. and Mrs. Pilates never tried to restrict the use of their name by others. Kryzanowska, plaintiff's principal witness, agreed that Mr. Pilates wanted "the Pilates method everywhere to be for the world so that everyone could benefit from it."

Kryzanowska operated the Pilates Studio during the 1970s and early 1980s and has been responsible for plaintiff's certification program since Gallagher purchased the Pilates marks. When asked "what do you do for a living?" at the beginning of her testimony, she replied, "I teach Pilates." Kryzanowska also agreed that some dance warmup exercises are sometimes called "the Pilates," "the way table tennis is called ping pong." When asked, "[w]hen people talk about Pilates, whether they do it as well as you or not as well as you, they're not talking about you, they're talking about this method of exercise, correct?" Kryzanowska replied, "I hope so." Finally, while Kryzanowska was

in charge of the Pilates Studio, she assisted in the writing of a book called *The Pilates Method of Physical and Mental Conditioning* and "dictated large portions" to the book's authors. Kryzanowska agrees that Pilates is a method of exercise.

Sean Gallagher used the term Pilates in a generic manner when he briefly owned the marks personally. In a letter dated April 5, 1993 inviting "Pilates Instructor[s]" to join The Pilates Guild, Gallagher used the word Pilates to identify a method of exercise:

> The Pilates Studio is also determined, for lack of a better phrase, to make Pilates a "household" word. As you know, The Pilates Exercise System has been a virtual exercise secret for over seventy years. Outside of New York and Los Angeles, even exercise enthusiasts have little or no knowledge of the system. It is only thanks to the enduring quality of Pilates exercise and the persistent and committed efforts of Pilates instructors in these and other cities that Pilates hasn't disappeared altogether!

*See also* Def. Ex. 1068 (New Mexico trademark application to "provide instruction in Pilates exercise system"); Def. Ex. 1062 (Colorado trademark application "to offer instruction in The Pilates Exercise System[,] provide facilities for Pilates Exercise, sell pilates Exercise Equi[pment]"); Def. Ex. 1070 (federal trademark application for "Pilates-based" mark "for exercise and physical conditioning for the Pilates exercise system and method").

Finally, plaintiff Pilates, Inc. has used PILATES in a generic manner on a number of occasions. For example, in an undated memorandum to all certified teachers by Elyssa Rosenberg, Associate Director of The Pilates Studio, plaintiff advises that "a change has been made to make The Method less generic in its description to the public and within the community." The change requires instructors to stop referring to "The Pi-

lates Method" and instead call it "The Pilates Method of Body Conditioning," and to refer to "the method" as "The Method." Moreover, plaintiff's lawyers frequently used Pilates in a generic sense during the course of the trial.[13]

■ Plaintiff argues that this evidence is irrelevant because it currently polices its marks vigorously and none of the uses described were made in connection with prospective purchasers of instruction services or exercise equipment. But when "the mark has 'entered the public domain beyond recall,' policing is of no consequence to a resolution of whether a mark is generic." *Murphy Door Bed*, 874 F.2d at 101 (quoting *King–Seeley Thermos Co. v. Aladdin Indus.*, 321 F.2d 577, 579 (2d Cir.1963)). The evidence described above shows that plaintiff and its predecessors, starting with Mr. Pilates himself, have used the word Pilates in a generic sense to describe a method of exercise.

Accordingly, this factor weighs in favor of genericness.

### 4. Media Usage

#### a. Newspapers and Magazines

■ Newspaper and magazine use of a term in a generic sense is strong evidence of genericness. *Harley–Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 811 (2d Cir. 1999).

Defendants submitted 775 articles dated after 1982 which use the word Pilates in some manner. Defendants divide these articles into four categories: (1) those which mention only plaintiff or its predecessors as the source of Pilates instruction, facilities, or equipment; (2) those which mention both plaintiff or its predecessors and others as sources for Pilates instruction, facilities, or equipment; (3) those which mention only others and not plaintiff or its predecessors as sources for Pilates instruction, facilities, or equipment; and (4) those which do not mention any source for Pilates instruction, facilities, or equipment.

Of these 775 articles, defendants claim that only 83(11%) mention plaintiff or its predecessors alone; 60(8%) mention both plaintiff or its predecessors and others; 165(21%) do not mention any source; and 467(60%) mention only other sources.

Plaintiff raises a number of objections to these articles. First, plaintiff argues that defendants' classification system is flawed because it only seeks to establish that sources other than plaintiff are identified with Pilates. Plaintiff argues that this is irrelevant because "[a] trademark need not identify source directly or explicitly." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 300 (3d Cir.1986). Plaintiff contends that because defendants admit that their third category "may include" some of plaintiff's licensees, the articles cannot show that the Pilates marks are generic because 610 of the 775 articles indicate some source.

This objection carries little weight. It is correct that "a term may function as an indicator of source and therefore as a valid trademark, even though consumers may not know the name of the manufacturer or producer of the product." *Id.* However, this principle is inapplicable to defendants' collection of articles, for two reasons. First, most of the articles use the word Pilates to describe a method of exercise—a use which plaintiff concedes is generic—in addition to identifying sources of Pilates services and equipment. Second, plaintiff has not shown that the articles imply that there exists a single "anonymous source" of Pilates services and equipment. Plaintiff's assertion that the 467 articles which mention only other sources of Pilates services and equipment include its licensees is unsupported by any evidence. Plaintiff's argument, in essence, is that because 610 of the 775 articles indicate some source of

---

13. For example, plaintiff's counsel argues that placing the word PILATES on the packaging for Pilates equipment "indicates use of the term PILATES in a descriptive manner and not as an indication of the source of the goods in question." (Def. Ans. Mem. at 41 n. 17.)

Pilates services and equipment, the Pilates marks are not generic. However, plaintiff has not shown, and cannot show, that the articles use the word Pilates to indicate a *single* source of services and equipment. The fact that 610 articles refer to a wide variety of sources is evidence that the term Pilates is generic.

Plaintiff's next objection is that only 270 of the articles were published prior to the commencement of this lawsuit. Plaintiff asserts that after defendants were sued, Endelman publicly encouraged members of the subsequently certified class to infringe plaintiff's marks. Thus, plaintiff argues, some of the articles written after 1995 referring to defendants or former class members were "conscious efforts to develop a self-serving body of evidence." (Pl. Ans. Mem. at 11.) However, none of the evidence cited by plaintiff shows that defendants encouraged others to start using, or to increase their use of, plaintiff's marks. At best, the evidence shows that Endelman counseled businesses already using the word Pilates that the class action would allow them to continue their existing uses without fear of being sued. Moreover, plaintiff does not identify which articles published after this lawsuit was filed refer to former class members. Thus, this objection carries little weight.

Plaintiff also raises numerous objections to the classification of specific articles. For example, plaintiff cites eight articles classified by defendants as indicating "no source" which in fact either refer to plaintiff's trademarks, plaintiff's licensees, or plaintiff itself. The classification of a handful of these articles is indeed ambiguous. Plaintiff also cites a number of articles referring to the trademark dispute and more than thirty articles referring to other names for exercise instruction services and equipment, such as "Physical-Mind," "Stott Core Conditioning," "Balanced Body Method," and "Polestar." As discussed above, the existence of a controversy over the marks and the existence of incentives for competitors to create new names to describe a generic, but heavily-policed, method of exercise do not weigh against genericness. Finally, plaintiff cites eighty-three articles referring to certification or special training programs, but there is ample evidence in the record that such services are offered by numerous sources other than plaintiff. Accordingly, these specific objections to the articles carry little weight.

Finally, plaintiff argues that there is no evidence of how these articles were gathered or selected for inclusion in defendants' submission. However, plaintiff had an opportunity to examine Endelman regarding how he collected many of these articles. Endelman testified that he gathered articles through the Bacon's clipping service starting in May 1999. Although it is not clear how the articles pre-dating May 1999 were gathered or selected, defendants do not appear to claim that the articles constitute a random sample of articles mentioning Pilates but rather show significant generic use of the term by the media.

### b. Books

In 1980 Doubleday & Co. published *The Pilates Method of Physical and Mental Conditioning* by Philip Friedman and Gail Eisen (*"The Pilates Method"*). A second edition was published in 1982 by Warner Books. The book does not mention a source or trademark for Pilates exercise instruction services or equipment. The book merely sets forth and illustrates the basic exercises which comprise the Pilates method of exercise. Indeed, plaintiff concedes that, as used in the title of this book, the word Pilates does not refer to an exclusive source of exercise instruction services. *See also* Ray Kybartas, *Fitness is Religion* 226 (discussing Pilates "as an alternative form of exercise").

*The Pilates Method* has been discussed in a number of news articles.

### c. Broadcast and Internet Evidence

Defendants submitted videotapes of various television broadcasts in which the word Pilates was used in a generic manner. Although some of the broadcasts are undated, most were aired between February 1995 and July 1997. The broadcasts include local and national news shows, such as the CBS Morning News, and national entertainment-oriented shows, such as "Hard Copy," "Entertainment Tonight," "Regis & Kathie Lee," and the game show "Greed." These broadcasts use "Pilates" to refer to a method of exercise and not to identify a source of services or equipment. Accordingly, this evidence weighs strongly in favor of genericness.

Defendants also submitted evidence of the use of the word "Pilates" on Internet web sites. Frank A. Cona, who operates a business specializing in searching, monitoring, and documenting intellectual property on the Internet, reviewed 318 web pages and concluded that 89% used the term Pilates to refer to a form of exercise and not a source of services or equipment.

While many of the web sites Cona identified do show generic use, Cona's numbers are questionable. First, Cona admitted that some of the sites he reviewed were outside the United States. Second, he admitted making numerous errors in his categorization of the web pages he reviewed. Accordingly, the evidence of Internet use of the word Pilates adds little to defendants' other evidence of newspaper, magazine, and television use of the term.

Overall, media use provides powerful evidence in favor of genericness.

### 5. Survey Evidence

Consumer surveys are routinely admitted in trademark cases to show genericness of a mark. *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 225 (2d Cir.1999); *Nestle Co. v. Chester's Mkt., Inc.*, 571 F.Supp. 763, 769 (D.Conn.1983). Each side submitted a survey in this case.

Defendants retained Dr. Michael Rappeport to conduct a survey to test whether the name Pilates is perceived as the name of a type of product or service or the name of a source. Rappeport's survey first screened respondents who were unfamiliar with the term Pilates; 200 of the 273 people surveyed answered that they were familiar with the word. The questions of principal significance were "Other than the word Pilates, is there some kind of word or short phrase that you use to refer to this type of exercise, or is Pilates the only word you use?" and the follow-up "Is Pilates the only word you've heard other people use?" The survey also asked, "Generally, in your own words, how would you describe Pilates?"

Of the 200 who were familiar with the word, no one provided a substitute word for Pilates. One-hundred-seventy-seven people responded that Pilates is the only word they use to describe the type of exercise. One-hundred-sixty-seven people responded that Pilates is the only word they hear others use to describe the type of exercise. The remainder provided sentences including "stretching," "mind and body," and other similar words and phrases. In response to the open-ended question "how would you describe Pilates?", everyone surveyed described Pilates as a type of exercise.[14]

Rappeport's survey also included questions about equipment. For example, respondents were asked "Are you aware of Pilates equipment?" and the follow-up "As far as you know, is Pilates equipment manufactured by: a) one company; b) several companies; c) or you don't know or don't have an opinion." 145 people had heard of Pilates equipment, and of these, 25 answered "one company," 41 answered "more than one company," and 79 answered "don't know or don't have an opinion."

---

14. These responses have limited value because the initial screening question in the survey asked whether the respondent had ever heard of Pilates "in the context of exercise or physical fitness training."

Other questions related to differences among exercises and types of equipment and are not particularly helpful to a determination of genericness.

Plaintiff objects to Rappeport's survey on a number of grounds. First, plaintiff argues that the wrong universe was surveyed with respect to the PILATES service mark. Rappeport chose as his universe a trade association of health professionals called IDEA. Plaintiff argues that IDEA members are not potential purchasers of exercise instruction services, but rather are potential vendors of such services, and thus are not "potential consumers of the product in question." *Conopco, Inc. v. Cosmair, Inc.,* 49 F.Supp.2d 242, 253 (S.D.N.Y. 1999) (JES). Plaintiff further argues that the wrong universe was surveyed with respect to the PILATES equipment mark. Plaintiff contends that the general public is the proper universe for Pilates equipment because plaintiff, through its licensee Stamina Products, markets equipment to the general public through mass market commercial channels.

Plaintiff's objections to Rappeport's survey universe reduce the survey's usefulness to some extent. It is undisputed that Pilates exercise instruction and equipment are increasingly being marketed to the general public. An ideal survey universe would include all potential purchasers of Pilates equipment or exercise instruction services, not just professionals who are members of IDEA.

However, the IDEA universe was adequate for the survey to have some weight in the genericness inquiry. First, plaintiff's own expert, Edward Epstein, testified that he analyzed the adequacy of Rappeport's survey universe and concluded that it was adequate. Indeed, Epstein used the same universe in his own survey. Second, although it is undisputed that Pilates instruction services and equipment are purchased by non-professionals in the general public, it is also undisputed that fitness professionals purchase Pilates equipment and receive training and certification in Pilates instruction. Thus, the IDEA universe includes potential purchasers of both Pilates equipment and Pilates services.

Plaintiff submits a survey by its own expert, Edward Epstein, to rebut Rappeport's findings. In his survey, Epstein asked respondents whether a number of purported "physical conditioning or fitness methods," including karate, yoga, "Crunch," and Feldenkreis, "may be used and promoted by trainers without having to obtain any company's authorization, permission or certification." Among those who were aware of each method, 17% responded that Pilates may be used without authorization; 66% said the same about karate; 74% said the same about yoga; 42% said the same about Crunch; and 17% said the same about Feldenkrais. Thus, Epstein concludes, the proportion of respondents who consider Pilates generic is far less than 50%.

Epstein also asked respondents who were familiar with the piece of equipment called the reformer "May any company that makes the Reformer put the Pilates name on the equipment or promote the fact that the company makes the Pilates Reformer, or may only those companies that are authorized to do so put the Pilates name on the equipment and promote the fact that the company makes Pilates Reformer?" 86% replied that only those companies that are authorized to do so may put the Pilates name on the equipment.

The main problem with Epstein's survey is that it is based on a faulty premise. According to Epstein, his survey was designed:

> to ascertain the primary significance or meaning of Pilates to the relevant universe or as Professor McCarthy puts it, what do buyers understand by the word? Is it seen as a method of exercise and apparatus that is available for anyone to use because it is a generic

type of exercise or is it seen as someone's proprietary property that cannot be used and promoted without obtaining authorization, permission or certification from the company that owns the rights to it?

When asked on cross-examination "Can we agree that if your premise is incorrect, that a method of exercise can be someone's proprietary property, then your survey tested the wrong thing?" Epstein replied, "I would say yes." Since plaintiff concedes that a method of exercise cannot be trademarked, it is clear by Epstein's own admission that his survey is fundamentally flawed since it assumes that a method of exercise can be someone's exclusive property. This is confirmed by the fact that 29% of those surveyed responded that the generic term "karate" could not be used without authorization and 25% said the same thing about the generic term "yoga."

Epstein's survey is also flawed with respect to the equipment question. The question assumes the existence of "those companies that are authorized to [use PILATES on equipment]." Just as the value of Rappeport's question "what is Pilates" is reduced because the answer is suggested elsewhere in the survey, so too is the value of Epstein's equipment question reduced because the question itself suggests the answer.

In sum, both surveys have serious flaws and neither is particularly helpful in determining whether the Pilates marks are generic.

### C. Assessment

1. The Primary Significance Of PILATES Is As A Method Of Exercise, Not As A Source Of A Product Or Service

■ No one disputes that there exists a distinct method of exercise based on the teachings of Joseph Pilates which people refer to as the "Pilates method" or simply as "Pilates." Nor is there any dispute that equipment designed by Mr. Pilates is an integral component of the Pilates method. The evidence described above shows that PILATES is understood by the public to refer to either the Pilates method (as in "I do Pilates") or to products or services used in connection with the Pilates method (as in "Pilates equipment" or "Pilates instruction"). In both uses of the word, the primary significance of PILATES is as a method of exercise, not as a source of a product or service.

Plaintiff nonetheless asserts that it may prevent others from using the name PILATES to describe instruction services and equipment. However, it is undisputed that plaintiff cannot prevent anyone from doing or teaching the exercises developed by Joseph Pilates or from manufacturing and selling equipment invented by Mr. Pilates (since the patents on those inventions have long since expired). Plaintiff's argument thus rests on the assumption that even if the word PILATES is understood by consumers as a generic term for a particular method of exercise, the word may still be appropriated to identify a particular source of services and equipment related to that method of exercise.

This argument was soundly rejected in *American Montessori Soc'y, Inc. v. Association Montessori Internationale,* 155 U.S.P.Q. 591 (T.T.A.B.1967). In *Montessori,* the Trademark Trial and Appeal Board held that the term MONTESSORI was generic as applied to a particular type of education and the "philosophy and methods associated therewith." *Id.* at 592. Responding to an argument similar to plaintiff's, the Board explained that "it necessarily follows that if the term 'MONTESSORI' is generic and/or descriptive as applied to the 'MONTESSORI' teaching methods, it is equally so as used in connection with toys, games, teaching aids, and other material employed in connection with said methods." *Id.* at 593.

This case is strikingly similar. Since the word PILATES is generic with respect to a particular method of exercise, it is necessarily also generic with respect to equip-

ment and services offered in connection with that method. The evidence shows that consumers identify the word PILATES only with a particular method of exercise, whether the word is used by itself or in connection with instruction services or equipment for use in that method. Plaintiff cannot monopolize a method of exercise by asserting trademarks in the generic word used to describe it.

### 2. PILATES Is A Genus, Not A Species

"A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is the species." *Abercrombie,* 537 F.2d 4, 9 (2d Cir.1976). The underlying assumption in plaintiff's position is that the relevant genus in this case is "the realm of exercise methods emphasizing core movements" and that the species is Pilates. (Pl. Letter of Jun. 19, 2000.) In plaintiff's view, other species include brands like Balanced Body, the Ron Fletcher Work, Polestar, and Core Dynamics. Under plaintiff's overgeneralized definition of the genus, any genus could be transformed to a species. For example, yoga would be classified as a species along with Pilates, even though yoga is a method of exercise that is properly classified as a genus.

Plaintiff's method of classification does not reflect the reality of what is actually taught under these names. With respect to the PILATES service mark, there is ample evidence that the Pilates method forms the basis for the Balanced Body Method, the Ron Fletcher Work, and other exercise instruction services. Even though these methods of instruction may differ in some respects from those used by plaintiff, all of them, including plaintiff's, are united by the Pilates method of exercise. Accordingly, in a proper system of classification, the Pilates method is the genus, and the particular ways of teaching that method are the species. Under this approach, the Ron Fletcher Work is a species of Pilates, as is the Balanced Body program.

### 3. No Word Other Than PILATES Can Adequately Describe Products And Services Based On The Pilates Method

A final factor in the genericness inquiry is the availability of other means to describe the product or service at issue.[15] The Second Circuit explained the importance of this consideration in *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137 (2d Cir.1997):

> Trademark law seeks to provide a producer neither with a monopoly over a functional characteristic it has originated nor with a monopoly over a particularly effective marketing phrase. Instead the law grants a monopoly over a phrase only if and to the extent it is necessary to enable consumers to distinguish one producer's goods from others and even then only if the grant of such a monopoly will not substantially disadvantage competitors by preventing them from describing the nature of their goods. Accordingly, if a term is necessary to describe a product characteristic that a competitor has a right to copy, a producer may not effectively preempt competition by claiming that term as its own.

*Id.* at 144. This rule is "based on long-standing and integral principles of trademark law." *Id.* at 145.

The evidence established that the word PILATES is necessary to describe the exercises and teachings that comprise the Pilates method. Although flawed in other respects, defendants' survey showed that consumers of exercise instruction services and equipment generally do not use any other term to describe the Pilates method. Numerous witnesses testified that they did not use any other expression to describe

---

**15.** This factor is sometimes considered separately under the rubric of a "fair use" defense. *See* 15 U.S.C. § 1115(b)(4); *EMI Cata-* *logue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 63–64 (2d Cir. 2000).

the Pilates method, nor could they even think of one. Efforts by plaintiff and its lawyers to avoid using PILATES in a generic sense result only in cumbersome expressions such as "exercises based on the teachings and methods of Joseph H. Pilates." Accordingly, this case falls squarely within the rule announced in *Genesee.*

Plaintiff offers two responses. First, plaintiff points to numerous other terms that it contends are adequate substitutes to identify the Pilates method of exercise. However, there was ample testimony by the creators of many of these terms that they still use the word PILATES to describe the nature of their products and services. Indeed, one of the alternative terms plaintiff identifies is Balanced Body, which is defendants' current brand name. However, defendants continue to use PILATES to describe their equipment and services for lack of a better term to do so. Moreover, many of the alternative terms identified by plaintiff (such as PhysicalMind) were created in response to plaintiff's threats of litigation. Such use does not weigh against genericness. *Murphy Door Bed,* 874 F.2d at 101 n. 2.

Second, plaintiff argues that it objects only to the use of PILATES in a trademark sense. However, plaintiff has never been able to state a coherent distinction between acceptable and unacceptable uses of the word. Moreover, such a distinction is inconsistent with plaintiff's policing of the mark. For example, in a cease and desist letter sent to Anthony Rabara in 1993, Gallagher informed Rabara that "[s]hould you choose not to pay the licensing fee, please understand that you will not be able to use the *Pilates* (R) name in your advertising, or any promotional materials. *You won't be able to call what you do Pilates.*" (emphasis added). Numerous other cease and desist letters prohibit the use of PILATES "in any manner." Accordingly, protecting plaintiff's marks would "effectively preempt competition." *Genesee,* 124 F.3d at 144

In sum, although plaintiff has made substantial efforts to police its marks and promote the Pilates method, it nonetheless cannot foreclose others from using the word PILATES to describe their services of which the equipment is an integral part. *See Abercrombie,* 537 F.2d at 10 ("[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name.")

### D. Conclusion

For the foregoing reasons, defendants have proven by clear and convincing evidence that the PILATES service mark and the PILATES equipment mark are generic.

### IV. Abandonment and Assignment in Gross

Defendants also claim that the PILATES marks were forfeited in two ways during the period in which the marks were owned by Healite, Inc. First, defendants argue that Healite abandoned the PILATES marks through nonuse after it closed its studio in April 1989. Second, defendants argue that Healite had no business goodwill when it transferred the marks to Sean Gallagher in 1992, and therefore the sale was an invalid assignment in gross. Although these defenses are somewhat related, they will be addressed separately.

### A. Abandonment

A trademark is deemed abandoned "[w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances." 15 U.S.C. § 1127. In order to show abandonment, defendants must show that plaintiff or its predecessors did not use the PILATES marks and did not intend to resume their use in the reasonably foreseeable future. *Stetson v.*

*Howard D. Wolf & Assocs.*, 955 F.2d 847, 850 (2d Cir.1992). In this case, two years of nonuse is prima facie evidence of abandonment.[16] The presumption of abandonment that arises from such nonuse is rebuttable. *Defiance Button Mach. Co. v. C & C Metal Prod. Corp.*, 759 F.2d 1053, 1060 (2d Cir.1985). The abandonment defense is available even against an incontestable mark. 15 U.S.C. § 1115(b)(2).

It is undisputed that Healite permanently closed its East 56th Street Pilates Studio on April 1, 1989. Plaintiff argues that despite the closing of the studio, Healite and its wholly-owned subsidiary, the second Pilates Studio, Inc., continued to use the PILATES marks in commerce. Defendants argue that any use from 1989 through 1992 was merely sporadic token use and that Healite's business was entirely defunct during that time period.

### 1. Evidence of Use

#### a. "Expansion" To New Locations

Plaintiff contends that Healite's business operations did not cease after the April 1989 closing of the Pilates Studio. Rather, plaintiff argues, Healite's business moved to other locations. Plaintiff points out that Hom moved most of the studio's equipment to three locations when he closed the studio—the neighboring chiropractic office of Dr. Howard Sichel; an exercise facility called Body Art; and an exercise facility called The Gym (now known as Drago's). Plaintiff argues that Hom assigned his teachers to work at these three locations. Plaintiff also points to the referral fees Hom received from these locations and his notification letters to clients concerning the new locations. Hom described this movement of equipment, clients, and instructors as "expanding in the sense of continuing the business and the exercises to different locations."

Hom's testimony that he moved equipment and instructors to other locations as an "expansion" of his business was not credible. First, Hom admitted that he moved the equipment to three locations because "[n]o one had large enough space for all of the equipment." Second, once the East 56th Street studio closed, Healite was no longer responsible for the instructors who went to teach at the other locations. Hom's testimony to the contrary was contradicted by more credible evidence.

After the studio closed, Dr. Sichel asked two instructors from the Pilates Studio to join him and paid them himself. Sichel paid a per-client referral fee to Hom personally for only a brief period of time. Hom never taught or supervised instruction at Sichel's business.

Dragutin Mehandzic ("Drago"), the owner of The Gym, was contacted by Kryzanowska about moving the Pilates Studio's equipment to The Gym. At the time, Drago did not know Hom. Since Kryzanowska started to teach at Drago's, Drago has paid her himself. Later, at Kryzanowska's request, Drago agreed to pay Hom a two percent fee for every customer. He explained that "I felt sorry for that place, Pilates Studio has to be closed and has to come to me. He was spending some time in the place teaching some people that they are not customers, just young girls, how to teach them how to teach." Drago never paid or agreed to any payment to Healite or the second Pilates Studio, Inc. In 1991, Drago gave Hom $3000 for all of the Pilates equipment Hom had moved to The Gym's premises, and stopped paying Hom referral fees.

Plaintiff makes much of the fact that Hom drafted a schedule assigning his instructors to shifts at either Body Art or The Gym. However, this does not show that Healite continued its business. One

---

**16.** The law currently provides that three consecutive years of nonuse is prima facie evidence of abandonment. 15 U.S.C. § 1127. However, the law during the period spanning 1989 to 1992 provided that two consecutive years was sufficient. *See* Pub.L. 103–465, § 521, 1994 Amendments; *Stetson,* 955 F.2d at 850.

instructor testified that the schedule was only in effect for one week and that she then made her own arrangements with the respective studios. There is no evidence that Hom made more than one or two such schedules, or that any schedules were followed for more than a brief period of time following the closing of the Pilates Studio.

Plaintiff also contends that Healite had licensing agreements with Body Art, Sichel's, and The Gym to use PILATES in connection with their facilities. However, Drago and Sichel credibly denied that they had any such arrangements with Hom, and Hom was not a credible witness.

In sum, Hom's only business connection with Body Art, Sichel's, or The Gym was the one to three dollar referral fee he received personally for customers at those locations for a limited period of time. There is no evidence of any business connections between these three locations and Healite or the second Pilates Studio, Inc.

### b. Training and Certification

Plaintiff next argues that Hom's continued certification of Pilates instructors shows that Healite's business continued after the Pilates Studio closed. However, plaintiff introduced evidence that only three instructors were certified by Hom: Amy Taylor (now Amy Taylor Alpers), Rachel Taylor, and Susan Moran. Hom's testimony that he trained others was not credible. Hom appeared to assume that instructors who were trained by Kryzanowska during this period were in effect trained by his business, a fact which is contradicted by the evidence of Kryzanowska's arrangements with Drago.

### c. The Taylor Sisters' License

Amy and Rachel Taylor, who operated (and still operate) an exercise studio in Boulder, Colorado, received a license from Hom to use the PILATES marks in connection with their studio for one year from their opening in November 1990. Hom granted the license in exchange for forgiveness of a $300 debt he owed the Taylor sisters for an undelivered piece of equipment. Upon the Taylor sisters' request, Hom also wrote a letter on Pilates Studio, Inc. letterhead calling the sisters' studio "my first official U.S. affiliate."

### d. Promotional Activities

Plaintiff points to a number of promotional activities engaged in by Hom to show that Healite and/or the second Pilates Studio, Inc. continued to use the PILATES marks. Hom printed and distributed cards around New York City advertising "PILATES(tm) METHOD STUDIO EXERCISES" at Body Art, The Gym and Sichel's. Hom also handed out brochures advertising the "Pilates Exerciser" and promoting the Pilates method on behalf of Healite and The Pilates Studio. Hom also placed five advertisements in *Dance* magazine between November 1990 and April 1991 offering information on "equipment, books, training seminars, and video" and referring inquiries to a toll-free telephone number Hom had obtained.

Plaintiff also points to Hom's teaching activities following the closing of the East 56th Street studio as evidence of continued use of the marks. Hom taught a course in Pilates at NYU. He also spoke at an international ballet conference in Mississippi in 1990. These activities do not show that Healite or the second Pilates Studio, Inc. used the PILATES marks in interstate commerce.

### e. Sales

There is evidence of only three sales of any products by Hom after April 1989. A professor at the NYU Department of Dance and Dance Education purchased a reformer and thirty copies of *The Pilates Method* for $2400 in July 1989. An August 1989 NYU purchase order for "Pilates Studios c/o Wee–Tai Hom" referenced a balance of $2170, although there is no evidence of what was in fact purchased. In 1990, Hom caused one piece of equipment

to be delivered to the Taylor sisters in Colorado in exchange for a sum of money. Hom never sold any equipment as a result of his advertisements in *Dance* magazine. Hom's testimony that he sold books as a result of those advertisements was not credible.

## 2. Evidence of Intent To Resume Use

In addition to arguing that Healite continued to use the PILATES marks from 1989 through 1992, plaintiff asserts that Healite did not intend to abandon the marks. In addition to the evidence described above, plaintiff cites Healite's efforts to sell its PILATES marks and to develop alternative business models as evidence of lack of intent to abandon the marks.

### a. Efforts To Sell Marks

Plaintiff contends that Healite made efforts to sell the PILATES marks during this period. Hom approached Endelman in 1991 to propose that Endelman purchase the marks and drafted a purchase agreement which he sent to Endelman. Hom spent several months in 1992 negotiating the purchase of the marks by Gallagher, a transaction which was eventually consummated.

### b. Alternative Business Models

Plaintiff next contends that Hom's efforts to devise alternative models for his Pilates business show that he did not intend to abandon the marks. In the middle of 1989, Hom drafted a proposal for purchasing a chain of fitness centers called "LivingWell" and incorporating Pilates instruction into those centers. He showed his proposal to an investor, Bruce Wrobel, and two businesses which were either investment banks or management consultants. Hom requested from LivingWell, and received, a list of fitness center markets in which LivingWell had a presence.

17. Plaintiff does not argue that Hom's sale of used equipment to The Gym and Dr. Sichel

In early 1990, Hom gave up on his hope to acquire LivingWell.

### 3. Assessment

Although it is a close question, defendants have failed to prove by clear and convincing evidence that Healite abandoned the PILATES service mark during the period between 1989 and 1992. The brochures handed out by Hom, the *Dance* magazine advertisements, and the license of the PILATES service mark to the Taylor sisters in Colorado are barely sufficient to show attempts to use the PILATES service mark during the period in question. Hom's efforts to sell the PILATES and PILATES STUDIO marks to Endelman and Gallagher and to acquire LivingWell are inconsistent with an intent to abandon the marks. *See Defiance Button,* 759 F.2d at 1060 (efforts to sell trademark during several years of nonuse defeat inference of intent to abandon mark); *Adolphe Lafont, S.A. v. S.A.C.S.E. Societa Azioni Confezioni Sportive Ellera, S.P.A.,* 228 U.S.P.Q. 589, 594, 1985 WL 71974 (T.T.A.B.1985) (efforts to find acceptable distributor of goods defeats inference of intent not to resume use despite seven years of nonuse).

However, defendants have proven by clear and convincing evidence that Healite abandoned any claim to the PILATES equipment mark. Only three types of evidence relate to the use of PILATES in connection with equipment. First, Hom sold two or three pieces of equipment to customers during this period.[17] Second, Hom distributed copies of a single brochure on behalf of Healite which advertised the "PILATES EXERCISER" and included an order form. Third, Hom included "equipment" among the types of information available from his toll-free number in the *Dance* magazine advertisements. None of plaintiff's remaining evidence constituted use of the equipment mark.

dence of trademark use relates to Pilates equipment.

"Minor activities" are not sufficient to avoid a finding of abandonment through nonuse. *Stetson,* 955 F.2d at 851. "To satisfy the use requirement, application of the trademark must be sufficient to maintain 'the public's identification of the mark with the proprietor.'" *Id.* (quoting *Silverman v. CBS, Inc.,* 870 F.2d 40, 48 (2d Cir.1989)). There is no evidence that Hom used the PILATES mark on the equipment itself or its packaging. The sporadic uses identified by plaintiff over the three-year period in question were not sufficient to maintain the public's identification of the PILATES equipment mark with Healite or Pilates Studio, Inc. *Cf. Warner-Lambert Co. v. Schick U.S.A., Inc.,* 935 F.Supp. 130, 143 (D.Conn.1996) (sales of over a thousand LADY SCHICK shavers in each of five consecutive years to over a hundred retailers and distributors nationwide were sufficient to maintain public's identification of LADY SCHICK mark with owner).

Moreover, there is no evidence that Hom intended to resume use of the mark. In fact, the agreement transferring the PILATES marks to Gallagher included a representation that Healite possessed no PILATES marks other than the PILATES STUDIO mark and the PILATES service mark. This representation is a stark admission by Hom that Healite abandoned whatever rights it may have claimed in a PILATES equipment mark.

### B. Assignment in Gross

■■■■ Defendants also argue that the PILATES service mark was abandoned when it was assigned by Healite to Gallagher without any corresponding goodwill.[18] "[A]n owner of a trademark or service mark may not assign the rights to that

mark 'in gross,' i.e. divorced from the appurtenant good will that the mark engenders." *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1350 (E.D.N.Y.1994); *see also* 15 U.S.C. § 1060(a); *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918). Good will is "the value attributable to a going concern apart from its physical asserts—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company. A trademark or service mark is merely the symbol by which the public recognizes that reputation and hence has no independent significance apart from the owner's good will." *Dial–A–Mattress,* 841 F.Supp. at 1350. Defendants contend that Healite was defunct by the time the PILATES marks were transferred to Gallagher in 1992 and thus did not possess any good will with which the marks could have been transferred.

■■■■ There is ample evidence that Healite's business had no substantial assets or income at the time of the transfer. The Pilates Studio itself was closed in April 1989. Hom sold all of the Pilates Studio's equipment to other exercise facilities. Hom referred all of the Pilates Studio's clients to those same facilities. Neither Healite nor the second Pilates Studio, Inc. filed any federal income tax returns after 1988. Neither Healite nor the second Pilates Studio, Inc. had a listing in the Manhattan telephone directory from 1989 through 1992. There is no evidence that either business earned any income after April 1989.

The only tangible assets Gallagher received in the transfer from Healite were a number of boxes of books, films, business records, and other documents. He also received Healite's client lists. However, Gallagher admits that he destroyed about

---

**18.** As discussed in Part V, *infra,* the PILATES equipment mark was not included in the assignment of marks from Healite to Gallagher. It is thus unnecessary to consider whether it was assigned without any corresponding

goodwill. Nonetheless, even if it is assumed that an equipment mark was transferred, it would have been an assignment in gross for the same reasons discussed with respect to the PILATES service mark.

eighty percent of the papers he received. He also admits that he threw away the client lists after approximately one year. Despite Hom's efforts to make his business a success, by 1992 no good will remained in Healite's business that could have accompanied an assignment of the PILATES marks.

Plaintiff argues that a naked transfer of a trademark is not invalid per se. It is correct that assignments without a corresponding transfer of physical assets will be upheld where the assignee is producing a product or providing a service which is substantially similar to that of the assignor and where consumers will not be deceived or harmed. *Marshak v. Green,* 746 F.2d 927, 930 (2d Cir.1984). Plaintiff argues that because its Pilates certification and training programs are similar to those offered by Healite and the second Pilates Studio, Inc., the assignment of the marks was valid even in the absence of good will.

The rule cited by plaintiff is inapplicable to this case. Cases like *Marshak* address only a situation where the owner of a trademark assigns that mark without also transferring the physical assets of the business to which that trademark was previously attached. A crucial distinction is that all decisions in which assignments have been deemed valid despite the absence of a transfer of physical assets held that the transferor business possessed good will at the time of the transfer. *See, e.g., Dial–A–Mattress,* 841 F.Supp. at 1350–51; *Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F.Supp. 899, 908 (E.D.N.Y.1988); *Money Store v. Harriscorp Fin.,* 689 F.2d 666, 678 (7th Cir.1982). Here, there is no evidence that Healite had any business or retained any good will that was symbolized by the PILATES marks.

Additionally, there is ample evidence that Gallagher was interested in purchasing only naked trademarks rather than a business with accompanying good will. Gallagher testified candidly that he contacted Hom to find out if Hom was interested in "selling the trademarks" and that he was negotiating to "buy the trademarks." He testified that he threw away eighty percent of the materials he received because "I didn't feel I had the need to have any of that because it was not my business." Gallagher's use of the term PILATES in his Synergy business with Steve Giordano prior to his purchase of the PILATES marks also shows that he sought only the ability to use the name PILATES rather than the good will associated with it. *See Clark & Freeman Corp. v. Heartland Co.,* 811 F.Supp. 137, 141 (S.D.N.Y.1993) (JSM). Finally, Hom recognized Healite's lack of good will and Gallagher's desire to obtain naked trademarks when he testified that "Sean Gallagher had his own business plan. He just wanted the trademark and our assets, which was the trademark."

Accordingly, defendants have proven by clear and convincing evidence that the transfer of the PILATES service mark to Gallagher was an invalid assignment in gross.[19]

## V. Prior Use

Defendants argue that they are prior users of the PILATES equipment mark, albeit in an unspecified geographic area, and thus possess the right to use PILATES on their equipment. In order to assert a prior use defense, defendants must prove four elements: (1) present rights in the mark; (2) acquired prior to the date of registration; (3) continual use of the mark since that date; and (4) use prior to the registrant on the goods or services that are in issue. *Dial–A–Mattress,* 841 F.Supp. at 1353–54. Defendants "must affirmatively demonstrate an unbro-

---

**19.** Based on a discovery order by Magistrate Judge Alan Kay of the United States District Court for the District of Columbia in a separate litigation involving the PILATES marks, defendants moved prior to trial to collaterally estop plaintiff from asserting that it is a successor in interest to Healite. Because the assignment in gross issue has been resolved on the merits in defendants' favor, defendants' motion is denied as moot.

ken continuum of use without significant interruption from a date prior to the maturation of plaintiff's rights in the mark. . . . [S]poradic use . . . is insufficient to overcome the strong policy behind the Lanham Act of rewarding those who first seek registration." *Id.*

Plaintiff asserts that it is the senior user of the equipment mark because its predecessors used the term PILATES in connection with equipment sales at least as early as 1970. However, not one of the agreements transferring the PILATES marks over the years refers to a mark for equipment even though they refer to the PILATES STUDIO and PILATES service marks. The assignment from Healite to Gallagher removes any doubt as to whether an equipment mark was transferred along the chain of custody. The assignment, like the previous assignments, refers to the PILATES STUDIO and PILATES service marks. However, Healite represents in the agreement that "[e]xcept for the [marks listed], Healite presently owns no other mark containing the word 'Pilates' or referencing 'Pilates' in any manner." Thus, plaintiff possesses no rights in an equipment mark beyond those which it may have established through its own use.

On the other hand, defendants have not established "an unbroken continuum of use" of the PILATES equipment mark starting prior to the maturation of plaintiff's rights in the mark. Defendants rely on two uses in support of their contention of prior use. First, Endelman testified that his business has used the label PILATES on approximately half of the crates for its reformers since 1980 or 1981. However, his testimony was equivocal on this point and he delicately avoided stating that the use was continuous to the present day. Second, Endelman and Ron Fletcher testified that starting in 1988 or 1989, defendants began affixing plaques directly on reformers reading, "THE PILATES RE-FORMER—Approved by Ron Fletcher." However, there is no evidence that this arrangement lasted longer than two or three years. Moreover, such use was not a trademark use since Fletcher requested that PILATES be used on the plaques, and no one but Fletcher purchased the equipment.

Defendants have thus shown only sporadic use of PILATES in relation to equipment prior to Gallagher's registration of the PILATES equipment mark. Accordingly, defendants have not proven all of the required elements of their prior use defense.

## VI. Fraud

██  A trademark registration, even if incontestable, is invalid if it was fraudulently obtained. 15 U.S.C. § 1115(b)(1). Allegedly fraudulent statements must show a deliberate attempt to mislead the Patent and Trademark Office ("PTO") and may not be the product of mere error or inadvertence. *Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir.1988). Moreover, the knowing misstatements must have been made "with respect to a material fact—one that would have affected the PTO's action on the applications." *Id.*

### A. The PILATES Service Mark

██  Defendants claim that the registration of the PILATES service mark is invalid because it was preserved by fraud. Specifically, they contend that the "Combined Declaration of Use and Incontestability" signed by Wee–Tai Hom in August 1992 was knowingly misleading because it falsely stated that the mark had been used continuously in interstate commerce between 1986 and 1991 and that it was still in use in interstate commerce on August 1, 1992. A failure to file an affidavit including these representations would have resulted in cancellation of the mark. 15 U.S.C. § 1058(a)—(b).

There is clear and convincing evidence that the statements of continuous and current use in interstate commerce were false. Except for the license to the Taylor

sisters in Colorado and the five advertisements in *Dance* magazine, Hom did not use the PILATES service mark in interstate commerce from 1989 to 1992. A single license and a handful of advertisements do not constitute continuous use. Moreover, there is absolutely no evidence that Hom was using the PILATES service mark in interstate commerce during 1992, the year in which he represented that he was currently using the mark.

However, defendants carry the heavy burden of showing fraudulent intent. *Woodstock's Enter. Inc. v. Woodstock's Enter. Inc.*, 43 U.S.P.Q.2d 1440 (T.T.A.B. 1997). "Fraud in a trademark cancellation is something that must be 'proved to the hilt' with little or no room for speculation or surmise; considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission; and any doubts resolved against the charging party." *Yocum v. Covington*, 216 U.S.P.Q. 210, 216 (T.T.A.B.1982). Although it is an extremely close question, defendants have not shown by clear and convincing evidence that the submission with respect to the PILATES service mark was knowingly false.

### B. The PILATES Equipment Mark

■ Defendants also claim that the PILATES equipment mark is invalid because it was procured by fraud. They rely on two submissions by Gallagher to the PTO in support of their contention. First, they cite the application for the PILATES equipment mark submitted by Gallagher to the PTO in September 1992, one month after he purchased the PILATES service mark from Healite. In that application, Gallagher affirmed that: (1) he owned the PILATES equipment mark; and (2) no other person or business had the right to use the PILATES equipment mark in commerce. Second, defendants cite a supplemental submission Gallagher filed in August 1994 in response to a March 1994 PTO denial of the original application. In this submission, Gallagher stated that the PILATES equipment mark had been used in commerce continuously and exclusively since 1923 and specifically for five consecutive years prior to the registration application. These representations, defendants argue, were knowingly and materially false.

First, Gallagher's statement that he owned the PILATES equipment mark was clearly false. As discussed in Part V, *supra*, Gallagher received no such mark from Healite when he purchased Healite's assets in August 1992. There is no evidence that Gallagher used PILATES in relation to equipment or otherwise acquired an equipment mark during the month between his acquisition of Healite's assets and his submission of the equipment mark application.

Plaintiff's only response is that Gallagher believed in good faith that he did in fact receive an equipment mark from Healite. However, Gallagher's testimony on this point, like his testimony on other aspects of the transfer of the marks from Healite, was evasive and lacked credibility. Gallagher could not have believed that he received an equipment mark from Healite. Gallagher initialed the two and one-half page assignment from Healite immediately below the representation that Healite did not own (and thus could not assign) any PILATES marks other than the PILATES service mark and PILATES STUDIO mark. Moreover, neither of the two prior written assignments (the first Pilates Studio, Inc. to Aris Isotoner and Aris Isotoner to Healite) mentioned an equipment mark. Gallagher's representation was a material and knowing misrepresentation.

Second, Gallagher's statement that the PILATES equipment mark had been used continuously in commerce was clearly false. As explained in Part IV–A, *supra*, Healite abandoned whatever equipment mark it may have had because it did not use the mark to sell equipment from 1989 through 1992. There is no evidence that even the few sporadic equipment sales by

Hom during that period included the PILATES mark on the equipment or its packaging, contrary to Gallagher's representation in the trademark application and supplemental submission that the mark was "used on the exercise equipment." In addition, Gallagher's submission of a copy of the patent plaque that had been used by Mr. Pilates on his equipment as a specimen of recent use was misleading because that plaque had not been used in any of the five years preceding the application and Gallagher had no reason to believe that the plaque had been so used. *See Torres v. Cantine Torresella*, 808 F.2d 46, 49 (Fed.Cir.1986).

Finally, Gallagher's vague testimony concerning his investigation of Healite's continuous use of the PILATES marks was not credible. He never inquired into Healite's sales of equipment using the PILATES mark. Indeed, Gallagher consciously avoided making any inquiries that would have resulted in evidence showing a lack of use. Gallagher thus had absolutely no basis for stating that the equipment mark had been used continuously in commerce. This misrepresentation was material because it related to an essential prerequisite for registration. Accordingly, Gallagher's representations in his registration application concerning his ownership of a PILATES equipment mark and the continuous use in commerce of that mark constituted a deliberate attempt to mislead the PTO.

Because defendants have proven by clear and convincing evidence that Gallagher's application for registration of the PILATES equipment mark contained material and knowing misrepresentations, the PILATES equipment mark registration is invalid.[20]

## VII. Unclean Hands

■ Defendants next argue that plaintiff's infringement claims are barred under the doctrine of "unclean hands" because Gallagher used the word PILATES in connection with Synergy Systems' instruction and equipment prior to his acquisition of the PILATES marks from Healite.

This argument can be dismissed summarily. Defendants do not, and cannot, cite authority for the proposition that where a junior user of a mark acquires that mark from the senior user, the junior user is forever barred from asserting claims for infringement of that mark. Such a rule would make little sense. Moreover, even if Gallagher's use of the word PILATES were considered inequitable conduct, it was discontinued long before the outset of this litigation, which precludes a finding of unclean hands. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:53 (4th ed.2000). Defendants' unclean hands defense lacks merit.

## VIII. Claim and Issue Preclusion

■ On the eighth day of the eleven-day trial, plaintiff moved for judgment as a matter of law on defendants' defenses on grounds of claim and issue preclusion. The basis for plaintiff's motion is a settlement agreement between plaintiff and the Joseph H. Pilates Foundation, Inc. (the "Foundation"), the defendant in an earlier infringement action. In that settlement agreement, the Foundation acknowledged the validity of the PILATES service mark and the PILATES equipment mark. Plaintiff argues that defendants were sufficiently involved with the Foundation to be bound by the terms of the settlement.

---

**20.** Defendants assert in their post-trial memoranda, without explanation, that they are entitled to damages under 15 U.S.C. § 1120, which authorizes an award for damages resulting from assertion of a fraudulently obtained trademark registration. However, defendants presented no proof of damages at trial. Moreover, they have not made the exceptional showing required to obtain an award of attorney's fees under this provision. *See Blue Bell, Inc. v. Jaymar–Ruby, Inc.*, 497 F.2d 433, 439 (2d Cir.1974); *Havana Club Holding, S.A. v. Galleon, S.A.*, No. 96 Civ. 9655, 1998 WL 150983, at *2 (S.D.N.Y. Mar. 31, 1998) (SAS).

Defendants argue that there is no privity between them and the Foundation, and that in any event, plaintiff has waived these defenses.

### A. Relevant Facts

The Foundation was a non-profit membership corporation formed by Endelman in 1994. Endelman was the Foundation's president throughout its existence. The Foundation's stated purpose was to function as an educational center and charitable organization for the Pilates community.

On May 5, 1995, plaintiff sued the Foundation in this district for infringement of its PILATES service mark and PILATES STUDIO mark. Current Concepts paid the bulk of the Foundation's defense costs. That action was settled on November 21, 1995.

Pursuant to the settlement agreement, the Foundation agreed to stop using the name PILATES and to change its name to "J.H.P. Foundation." The Foundation also "acknowledge[d]" and "agree[d] not to directly or indirectly challenge" the "validity and ownership" of the PILATES service mark and the PILATES equipment mark.

The Foundation is now defunct.

### B. Waiver

Defendants contend that plaintiff has waived its claim and issue preclusion defenses. Plaintiff never asserted claim or issue preclusion in any of its pleadings. Nor did plaintiff raise issue or claim preclusion at the final pretrial conference or in the joint pretrial order. The first time plaintiff raised the matter was on the eighth day of trial, four and one-half years after the complaint was filed and more than three years after the filing of defendants' answer, counterclaims, and class action complaint.

Federal Rule of Civil Procedure 8(c) requires affirmative defenses such as claim or issue preclusion to be raised in pleadings responding to claims for relief.[21] Rule 15 allows pleadings to be amended by leave of the court only "when justice so requires." Fed.R.Civ.P. 15(a); *see also MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 962 (2d Cir.1998). Additionally, the parties in this case were required to set forth all of their proposed findings of fact and conclusions of law in a joint pretrial order pursuant to Rule 16. Fed.R.Civ.P. 16(c), (e). A pretrial order "shall be modified only to prevent manifest injustice." Fed.R.Civ.P. 16(e); *see also* Rule 16, Advisory Committee Notes for subdivision (c) ("If counsel fail to identify an issue for the court, the right to have the issue tried is waived .... the rule's effectiveness depends on the court employing its discretion [to modify a pretrial order] sparingly."); *Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 805 F.2d 49, 52 (2d Cir.1986).

Plaintiff was a party to the Foundation litigation and was thus well aware from the outset of this case of any possible relationship between the Foundation and defendants that could support claim or issue preclusion. Plaintiff's only proffered excuse for not raising claim or issue preclusion earlier is that it had no incentive to do so during the pendency of the class action, which ended with the decertification of the

---

**21.** Plaintiff disputes whether claim and issue preclusion are affirmative defenses that must be asserted in a responsive pleading pursuant to Rule 12(c) or merely responses to an affirmative defense raised by defendants which need not be asserted in a responsive pleading. However, defendants (along with the class when it existed) have asserted claims for cancellation of plaintiff's marks for more than three years. Plaintiff was required to assert all potential defenses in its answer to those claims. Fed.R.Civ.P. 12(c). Second, regardless of how plaintiff's defenses are characterized, they were required to be included among plaintiff's contentions of law in the joint pretrial order. And third, contrary to plaintiff's suggestion, it could have attempted to dispose of defendants' defenses on issue and claim preclusion grounds at the outset of the case by moving for summary judgment or to strike defendants' defenses pursuant to Rule 12(f).

class shortly before the final pretrial conference. Plaintiff suggests that because Current Concepts was only one of seven class representatives, no practical purpose would have been served by attempting to dismiss Current Concepts as a class representative.

Plaintiff's excuse is insufficient. The pleading requirements of the federal rules are fully applicable in class actions. *See* 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1789 (1997). Plaintiff could have raised its claim and issue preclusion defenses against Current Concepts' cancellation claims, but chose not to do so. Plaintiff's failure to assert this defense was a tactical choice for which it must bear the consequences. *Cf. Seneca Nation of Indians v. State of New York,* 26 F.Supp.2d 555, 569 (W.D.N.Y.1998) (plaintiffs' strategic decision to not assert defense did not show a lack of opportunity to litigate it; "[plaintiffs] cannot blame their silence on other parties"). Moreover, plaintiff received notice during a series of telephone conferences prior to the final pretrial conference that the class action would be decertified. Plaintiff's failure to include issue or claim preclusion in the joint pretrial order was thus especially inexcusable.

Nor has plaintiff shown that denial of permission to amend the pleadings or pretrial order would result in manifest injustice. On the contrary, allowing plaintiff to assert this defense for the first time in the waning hours of this litigation would be unfair to defendants, who have spent four years preparing at great expense to try the case on the merits. Moreover, the purpose of issue and claim preclusion is to promote judicial efficiency, a goal which would not be advanced by allowing plaintiff's defense to be raised in the middle of trial. *See Davis v. City of Chicago,* 53 F.3d 801, 803 (7th Cir.1995) ("Preclusion serves a vital purpose, inducing people to combine claims and theories that are efficiently litigated jointly, and preventing the waste of judicial resources (and the ad-

verse parties' time) that sequential suits create."). This litigation has already ended, and preclusion would not serve its intended purpose.

This case bears a striking similarity to *Evans v. Syracuse City School Dist.,* 704 F.2d 44 (2d Cir.1983). In *Evans,* the defendant in a Title VII action asserted a claim preclusion defense nearly three years after the defense could have been first asserted and six days before trial. Nonetheless, the district court granted the defendant leave to amend its answer to incorporate the defense. The Court of Appeals reversed, finding that the district court abused its discretion in granting leave to amend. The court concluded that defendant had offered no satisfactory explanation for its delay in raising the defense and that plaintiff had been prejudiced by expending time and resources on discovery and preparation for trial. *Id.* at 46–47. The same conclusions can be drawn from the facts of this case, and the same result must be reached. Plaintiff has waived its issue and claim preclusion defenses.

### C.   The Defenses

Even if plaintiff did not waive res judicata and collateral estoppel, preclusion fails on the merits. Neither claim nor issue preclusion prevents defendants from litigating the validity of plaintiff's PILATES marks.

Under the doctrine of claim preclusion, or res judicata, "a prior decision dismissed 'on the merits' is binding in all subsequent litigation between the same parties on claims arising out of the same facts, even if based upon different legal theories or seeking different relief on issues which were or might have been litigated in the prior action but were not." *Northern Assurance Co. of Am. v. Square D Co.,* 201 F.3d 84, 87 (2d Cir.2000) (quoting *EFCO Corp. v. U.W. Marx, Inc.,* 124 F.3d 394, 397 (2d Cir.1997)) (internal quotation marks omitted). A judgment of dismissal pursuant to a settlement agreement can

constitute a final judgment "on the merits." *Amalgamated Sugar Co. v. NL Industries, Inc.*, 825 F.2d 634, 639–40 (2d Cir.1987).

The doctrine of issue preclusion, or collateral estoppel, "bars the relitigation of issues actually litigated and decided in [a] prior proceeding, as long as that determination was essential to that judgment." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.1995). Issue preclusion has four elements: (1) the issues of both proceedings must be identical, (2) the relevant issues must have been actually litigated and decided in the prior proceeding, (3) there must have been "full and fair opportunity" for the litigation of the issues in the prior proceeding, and (4) the issues must have been necessary to support a valid and final judgment on the merits. *Id.* Plaintiff argues that the validity of the PILATES marks was adequately litigated and decided in the Foundation case and thus cannot be relitigated in this case.

Neither claim nor issue preclusion bars litigation of the validity of the PILATES marks in this case because plaintiff has not proven an essential element of both claim and issue preclusion: that defendants were in privity with a party that had adequate incentive and opportunity to litigate the previous action. *Haring v. Prosise*, 462 U.S. 306, 311, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983) ("[A]mong the most critical guarantees of fairness in applying collateral estoppel is the guarantee that the party to be estopped had not only a full and fair opportunity but an adequate incentive to litigate 'to the hilt' the issues in question."); *Alpert's Newspaper Delivery Inc. v. The New York Times Co.*, 876 F.2d 266, 270 (2d Cir.1989).

The factors plaintiff cites to show privity include: Endelman's status as president and founder of both the Foundation and Current Concepts; Current Concepts' financing of the Foundation's defense; and the Foundation's distribution of videotapes produced by Current Concepts. Plaintiff argues that these factors, combined with the common interest shared by Current Concepts, Endelman, and the Foundation in challenging the PILATES marks, establish that defendants and the Foundation were sufficiently connected to establish privity.

However, although defendants and the Foundation were closely related, their interests with respect to litigating the validity of the PILATES marks were distinct. While Current Concepts is a long-standing business operated for profit, the Foundation was a non-profit membership organization operated for educational and charitable purposes. The Foundation was financed by contributions from its 120 members, while Current Concepts is financed by its equipment and other product sales. The Foundation and Current Concepts kept different books, maintained separate bank accounts, and had different accountants and attorneys. This evidence shows that Current Concepts and the Foundation were distinct organizations with distinct financial interests.

Even more important to a showing of lack of privity are the facts relating specifically to the Foundation litigation. Plaintiff's suit against the Foundation exhausted the Foundation's limited funds, giving it a powerful incentive to settle the case despite receiving financial support from Current Concepts during the brief duration of the litigation. Endelman consulted with the Foundation's members before agreeing to settle the case on the Foundation's behalf. From a commercial perspective, the stakes were much lower in the action against the Foundation than in this case, creating "little incentive to defend vigorously." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). This conclusion is confirmed by the realities of the respective litigations: the Foundation case lasted six months and involved only one defense (with respect to a preliminary injunction) and minimal motion practice, while this

case has lasted over four years and has involved extensive discovery, several defenses, numerous counterclaims, a certified class action, and an eleven day bench trial.

Additionally, although the Foundation settlement agreement expresses an intent to preclude the Foundation from challenging the validity of any of the PILATES marks, it evinces no such intent to preclude challenges by Endelman or Current Concepts. Prior to the settlement, plaintiff discussed a global settlement with Current Concepts, Endelman, and the Foundation. Defendants rejected the offer. After the Foundation case was settled, defendants continued their settlement discussions with plaintiff. Plaintiff sued defendants approximately one month after the settlement, and as discussed previously, did not raise claim or issue preclusion until more than four years later. These facts show that plaintiff, defendants, and the Foundation clearly understood the settlement agreement to bind only the Foundation.

In view of the Foundation's significant interest in settling its case, it cannot be concluded that Current Concepts or Endelman was "adequately represented" in that action. "[R]epresentative capacities must be held separate in order to ensure vigorous pursuit of litigation without concern about the possible impact on other interests." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4451. The corollary to this principle is that representative capacities must also be held separate to allow appropriate *settlement* of litigation without concern about the possible impact on other interests. This policy would not be furthered by holding defendants to be in privity with the Foundation.

The incentives to litigate the two cases were vastly different. It would be unfair to bind defendants to a settlement agreement in which they specifically declined to participate and had little financial interest in joining. Accordingly, plaintiff cannot

prove a required element of its preclusion defenses.

## CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, the Clerk shall enter judgment for defendants on all of plaintiff's claims. The Clerk shall direct the United States Patent and Trademark Office to cancel Pilates, Inc.'s registrations for the PILATES service mark (Reg. No. 1,405,304, registered August 12, 1986) and the PILATES equipment mark (Reg. No. 1,907,447, registered July 25, 1995).

SO ORDERED.